976 So.2d 910 (2007)
James MOFFETT, Appellant
v.
HOWARD INDUSTRIES, INC., Appellee.
No. 2006-WC-01313-COA.
Court of Appeals of Mississippi.
May 29, 2007.
Rehearing Denied November 27, 2007.
*911 Leonard Brown Melvin, Hattiesburg, attorney for appellant.
Douglas S. Boone, Laurel, attorney for appellee.
Before KING, C.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.

STATEMENT OF THE CASE
¶ 1. This worker's compensation case began when James Moffett suffered an admittedly compensable injury to his back while working for Howard Industries, Inc. in August 2001. After conservative treatment and following evaluations by several physicians, one physician suggested surgery. To determine whether the proposed surgery was reasonable and necessary, the administrative judge ordered an independent medical evaluation (IME). Although the result of the IME was an opinion that surgery was not needed, no order was issued as to whether the proposed surgery was reasonable and necessary. Notwithstanding the absence of an order, Moffett proceeded to have the surgery. The procedure was later determined not to have been reasonable and necessary by the administrative judge. This decision was affirmed by the Full Commission and the Circuit Court of Jones County. Moffett now appeals and raises the following issues:
I. WHETHER THE SURGERY PERFORMED BY DR. MOLLESTON ON JANUARY 23, 2003, WAS A REASONABLE AND NECESSARY MEDICAL PROCEDURE ARISING OUT OF THE COMPENSABLE INJURY SUFFERED BY MOFFETT ON AUGUST 3, 2001.
II. WHETHER THE COMMISSION ERRED IN HOLDING THAT MOFFETT DOES NOT SUFFER FROM PERMANENT PARTIAL DISABILITY AND WAS NOT ENTITLED TO TEMPORARY TOTAL DISABILITY BENEFITS.
III. WHETHER THE FINDINGS OF THE COMMISSION WERE SUPPORTED BY SUBSTANTIAL EVIDENCE.
Finding no error, we affirm.

STATEMENT OF THE FACTS
¶ 2. Moffett began working for Howard in 1993. After briefly filling other positions within Howard, Moffett began working as a core winder. He injured his back in 1996 and was initially treated with medication, physical therapy and rest. This treatment continued until February 1998, when Dr. Michael Fromke, Moffett's treating physician, stated:
The question, of course, would be whether or not these findings are related to an *912 on [-]the[-]job injury. They are consistent with lumbar spondylosis, which is a chronic degenerative, ongoing process and was pre-existing prior to the injury. It is the pain that was correlated with the injury and how that relates to the radiographic findings according to natural pathophysiology is more of an inflammatory response with chemical mediators of inflamation producing pain due to this chronic and degenerative process that's occurring at L5, and to a mild degree, at L2. Surgery is really not an option here since the potential outcome is debatable.
Moffett continued to work as a core winder until August 3, 2001, when he suffered another on-the-job injury while attempting to wind a 1,000-pound core. Moffett was initially seen by an emergency room doctor the day of his injury who took him off work for one week and referred him to Dr. Thomas H. Blake, Jr. at the Laurel Bone and Joint Clinic. Dr. Blake examined Moffett on August 17, 2001. During his examination of Moffett, Dr. Blake made note of a MRI scan done on August 8, 2001, which showed "minimal generalized disc bulging at L4-5 with minimal right posterolateral disc protrusion encroaching upon the neural foramen at L5-S1." Dr. Blake referred Moffett to Dr. Steven D. Nowicki, prescribed Moffett medications, and ordered that he stay off work until his appointment with Dr. Nowicki on August 28, 2001. Dr. Nowicki noted that Moffett's MRI showed "some mild disc bulging toward the right at 4-5" and added "this is nothing that I think is significantly encroaching upon any of the neural elements." Moffett requested a second opinion, but Dr. Nowicki would not refer him further.
¶ 3. Moffett then saw his family doctor who referred him to Dr. Michael Molleston. Dr. Molleston first saw Moffett on October 29, 2001, and ordered a MRI scan of the cervical spine and lumbar discogram because he "thought that surgery was appropriate with regards to treating his disc rupture at L5-S1; and that perhaps a fusion at L4-5 should be accomplished, as well." Prior to the discogram, Howard sent Moffett to Dr. Lon Alexander for another evaluation. Based on his examination, conducted on March 20, 2002, and review of the lumbar spine and cervical spine MRIs, Dr. Alexander concluded that surgery was not needed. Additionally, Howard was ordered to provide Moffett with an independent medical evaluation by Dr. Robert R. Smith. Dr. Smith examined Moffett on October 1, 2002, and concluded that "[Moffett] does not need any surgery. He does not need any further procedures." Moffett attempted to return to work at Howard as a sorter, a job in which he could sit or stand and sort miscellaneous screws and bolts collected throughout the Howard facility, but after two hours stated he could not continue.
¶ 4. A discogram of each of Moffett's vertebrae was completed on November 5, 2002, followed by a CT scan. Subsequently, Dr. Molleston performed a lumbar laminectomy, discectomy and interbody fusion at L4-5 and L5-S1 in January 2003. This was eventually followed by a second evaluation by Dr. Alexander.

PROCEDURAL HISTORY
¶ 5. Moffett filed a petition to controvert on November 19, 2001, claiming injury to his back, legs, hips, left hand and wrist. In its answer filed January 8, 2002, Howard admitted that Moffett's injury occurred during the course of his employment. However, a dispute arose regarding the reasonableness and necessity of surgery. Following Dr. Molleston's recommendation for surgery, Howard filed its motion for adjudication as to whether the surgery was reasonable and necessary, or, in the alternative, for an independent medical exam of Moffett to determine such. Subsequently, on October *913 8, 2002, the administrative judge ordered an independent medical evaluation to be conducted by Dr. Smith. Following a hearing held on June 1, 2004, the administrative judge issued an order on March 30, 2005,[1] which found that Moffett suffered a compensable, work-related injury to his lower back on August 3, 2001; his average weekly wage on that date was $459.32; there was no evidence presented to support his claim of injury to his left hand and wrist; the neck problems of which Moffett complained were not causally related to his injury; the surgery performed by Dr. Molleston was not required by the nature of Moffett's work-related injury; Moffett was temporarily totally disabled from August 3, 2001, until Dr. Smith's evaluation of October 1, 2002, and again from January 23, 2003, until January 24, 2004, while recovering from surgery; the surgery was not an independent intervening cause so as to cut off Moffett's right to permanent disability benefits; and that as a result of the injury, Moffett suffered a permanent partial impairment or loss of wage-earning capacity of fifty percent of the wage he was earning at Howard. The administrative judge then ordered temporary total disability benefits of $306.21 per week from August 3, 2001, until October 1, 2002, and again from January 23, 2003, until January 24, 2004; permanent partial disability benefits of $153.11 per week for 450 weeks beginning January 24, 2004; that Howard pay any penalties and interest due from unpaid benefits; and provided medical services and supplies needed as a result of Moffett's injury, excluding the surgery performed by Dr. Molleston.
¶ 6. Howard then filed its petition for review before the Full Commission on April 12, 2005, followed by Moffett's cross-petition for review before the Full Commission. After a hearing by the Commission, it amended the March 30, 2005 order of the administrative judge. In the Commission's order, it found the administrative judge erred in awarding temporary total benefits from January 23, 2003, until January 24, 2004, as it opined that "[w]hen a medical procedure is not found to be the reasonable and necessary result of a workers' compensation injury, the claimant should not be entitled to temporary total disability benefits following that procedure." Additionally, the Commission held that an award of permanent partial disability benefits was also erroneous. In holding as such, the Commission found that, pursuant to Dr. Smith's opinion, Moffett could have returned to work in the fall of 2002, and despite Howard's offer of re-employment, Moffett declined employment and elected to have the surgery without the consent or knowledge of Howard or the Commission. Finally, the Commission ratified the remaining provisions of the administrative judge's order.
¶ 7. Moffett then appealed the Commission's order to the Circuit Court of Jones County, Second Judicial District. The circuit court summarily affirmed the Commission's order as it found that it was supported by substantial evidence and properly applied the law. From this order, Moffett now appeals to this Court.

STANDARD OF REVIEW
¶ 8. On appeal, this Court may only review an administrative agency's order to determine if it "1. Was supported by substantial evidence; or 2. Was arbitrary or capricious; or 3. Was beyond the power of the lower authority to make; or 4. Violated some statutory or constitutional right of the complaining party." URCCC 5.03. *914 "This Court will reverse the Commission's order only if it finds that order clearly erroneous and contrary to the overwhelming weight of the evidence." Hardaway Co. v. Bradley, 887 So.2d 793(¶ 11) (Miss. 2004) (quoting Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). "A finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act." Hardaway, 887 So.2d at (¶ 11) (quoting Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 780 (Miss.2003)). Additionally, "the Commission is also the ultimate judge of the credibility of witnesses." Barber Seafood, Inc. v. Smith, 911 So.2d 454(¶ 27) (Miss.2005). "Further, neither this Court nor the Mississippi Supreme Court is empowered to determine where the preponderance of the evidence lies when the evidence is conflicting. Instead, this Court must affirm the decision of the Commission where substantial credible evidence supports the Commission's order." Id. (citations omitted).

ANALYSIS
I. WHETHER THE SURGERY PERFORMED BY DR. MOLLESTON ON JANUARY 23, 2003, WAS A REASONABLE AND NECESSARY MEDICAL PROCEDURE ARISING OUT OF THE COMPENSABLE INJURY SUFFERED BY MOFFETT ON AUGUST 3, 2001.
III. WHETHER THE FINDINGS OF THE COMMISSION WERE SUPPORTED BY SUBSTANTIAL EVIDENCE.[2]
¶ 9. Moffett argues that the Commission's finding that the surgery was not reasonable and necessary was clearly erroneous and not supported by substantial evidence. He cites Hardaway Co. v. Bradley, 881 So.2d 241(¶ 22) (Miss.Ct.App. 2004) (citing Spann v. Wal-mart Stores, Inc., 700 So.2d 308 (¶¶ 31-32) (Miss.1997)) in support of his claim that "as long as a particular treatment is deemed reasonable and necessary by a competent treating physician, the employer is obligated to furnish the treatment." However, the above quote is not a correct statement of the law, as noted in the supreme court's reversal of Hardaway. See Hardaway Co. v. Bradley, 887 So.2d 793 (Miss.2004) (¶ 18). In Hardaway, the claimant was treated by one physician who recommended surgery and evaluated by two other physicians who did not recommend surgery. Hardaway, 887 So.2d at (¶ 14). The supreme court stated, "here, with the testimony of two physicians, who conducted independent medical examinations, the Commission's decision was supported by more than a scintilla of evidence. Therefore, `substantial evidence' supporting the Commission's decision was present." Id. (citing Hardaway, 881 So.2d at (¶ 28) (Griffis, J., dissenting)).
¶ 10. Additionally, in Spann, the treating physician felt surgery was needed, a second physician opined there was a 50/50 chance surgery would help and a third doctor found that Spann did not need surgery. Id. at (¶¶ 8-10). However, the third doctor's opinion was found to be not credible. Id. at (¶ 9). In concluding that there was substantial evidence that surgery would help Spann reach maximum medical recovery, the supreme court noted that the only credible evidence before the Commission concerning the surgery was *915 testimony from one physician claiming surgery would help and another claiming that there was a 50/50 chance it would help. Id. at (¶¶ 15-16). The supreme court explained that, "Spann was not given the surgery simply because his treating physician prescribed it, but because the Commission was not presented with any other credible evidence to the contrary." Hardaway, 887 So.2d at (¶ 18).
¶ 11. In the case sub judice, the Commission was presented with numerous reports and deposition testimony from various medical professionals, most notably, Drs. Nowicki, Molleston, Alexander and Smith. Dr. Nowicki, a board-certified orthopaedic surgeon, after reviewing five x-rays of the lumbosacral spine and an MRI scan, noted that disc cases were well preserved and bone density appeared normal. Additionally, Dr. Nowicki noticed some mild disc bulging at the L4-5 level, but saw nothing significantly encroaching on any of the neural elements. However, Dr. Nowicki did not explicitly give an opinion for or against surgery.
¶ 12. Dr. Molleston, a board-certified neurosurgeon, was the next physician to see Moffett. Dr. Molleston first saw Moffett in October 2001. After reviewing the lumbosacral spine MRI, Dr. Molleston noted that it showed disc herniation at L5-S1 and disc bulging at L4-5. After a physical examination, Dr. Molleston further noted that straight leg raising was positive for pain at ten degrees, lumbar spasms were present and cervical spasms were present. Dr. Molleston recommended an MRI of Moffett's cervical spine and a lumbar discogram. Molleston also felt surgery was appropriate.
¶ 13. Dr. Alexander, a board-certified neurosurgeon, examined Moffett for the first time in March 2002, after the discogram was recommended, but Dr. Alexander believed a myelogram, rather than a discogram, was recommended. After examining Moffett, Dr. Alexander noted no spasms in Moffett's back and full range of motion. Also, Dr. Alexander rated Moffett's strength in all muscle groups tested as 5 out of 5. He noted that the MRIs showed a modest bulge at L5-S1, but did not consider it worthy of surgery. Finally, Dr. Alexander stated that he did not totally disagree with Dr. Molleston's suggestion to conduct a myeolgram, but added that unless it showed something the MRIs did not, surgery would not be appropriate.
¶ 14. Moffett was next examined by Dr. Smith, a board-certified neurosurgeon who passed away in 2003. Following his examination and review, Dr. Smith concluded as follows:
Minor disc bulge, L5-S1 with degenerative changes in the cervical spine. His clinical findings are functional and nonanatomical. His MRI shows about what would be expected of any forty-seven year old man, especially one that weighs 260 pounds.
He does not need any surgery. He does not need any further procedures. I rate his impairment at 0. He has no significant restrictions, could return to light productive work. I would start him in a work hardening program or light work progressing to regular work.
As it turned out, Dr. Alexander knew Dr. Smith very well as the two worked together for many years. As a result, during his deposition, Dr. Alexander was asked to review Dr. Smith's report. Speaking to Dr. Smith's credibility, Dr. Alexander testified that Dr. Smith had no peer in the medical community. He noted that Dr. Smith conducted a straight-leg raising test in which Moffett expressed pain at five degrees. However, in his report Dr. Smith stated "flexion did not relieve the pain produced." Dr. Alexander explained that the pain experienced during the *916 straight-leg raising test should be extinguished when the patient bends his knees, and Dr. Smith's statement showed that this was not the case. Additionally, Dr. Smith explained, "it should be noted that the patient walked without restriction, which requires more than five degrees of leg-raising flexion." These findings are obviously inconsistent with those reached by Dr. Molleston.
¶ 15. The discogram was performed in November 2002. It indicated pain at each vertebrae. Specifically, Moffett experienced pain rated as 5-6 out of 10 at L5-S1 and 4-6 out of 10 at L4-5. The remaining three vertebrae were rated as 7-8 on a scale of 10. In expressing his doubt in the usefulness of the results, Dr. Alexander stated:
Discography has probative value if one finds one disc or two discs perhaps that are the generators of pain; and then that can be, as I think I called it earlier, the icing on the cake if that corresponds with an MRI finding at that same level and if that corresponds with a neurologic examination at that same level and if all those things  if all  if Matthew, Mark, Luke and John all agree on the same topic, then the discography is pertinent. What was reported in this discogram was that every single disc in the lumbar spine caused as extreme amount of pain. As a matter of fact, the L5-S1 level itself, which was the level bulging, didn't seem to cause as much pain as even the L2/3 level where pain was graded as seven to eight on a grade of ten. I personally, even being someone that doesn't totally reject discography, would use this discogram as a rather ironclad reason not to operate on someone. If they hurt at every single disc of the back, then is one to fuse every disc of the back? So I think you have to look at this discogram as a procedural hole. And looking at this discogram, if I had been presented with this data, I would have told this patient yet again that no surgery would avail him any relief.
Dr. Alexander further stated, "Based upon the criteria that I use, I would not have recommended those surgeries. Would have predicted if those surgeries were performed, that they would afford no relief, and therefore do not find them necessary."
¶ 16. During Dr. Alexander's second examination of Moffett on August 5, 2003, he noted that Moffett had full range of motion about his neck and no appreciable lumbar spasm. Dr. Alexander also stated that Moffett was overly histrionic during the exam, and was uncooperative during the strength test of the lower extremities. Additionally, he stated that Moffett exhibited numerous Waddell's signs, which are indications that a patient is being less than forthcoming concerning the extent of his injury.
¶ 17. During Moffett's deposition on June 20, 2003, he stated that nothing had changed and he was about the same as he was before the operation. However, during the June 2004 hearing, he stated that he was somewhat better. Moffett testified that the numbness in his right leg was lessened, though still present, and he was still having pain, though not as much. Despite the improvement, Moffett testified that he still could not work as of that day.
¶ 18. Therefore, based upon the reports and testimony of Drs. Nowicki, Alexander and Smith, we cannot say that the Commission's decision lacked substantial evidence or was clearly erroneous. As such, this issue is without merit.
¶ 19. Moffett further argues that his surgery should be deemed inherently reasonable and necessary because Dr. Molleston testified that he discovered disc herniation during the surgery. In support, Moffett cites Marshall Durbin Cos. v. *917 Warren, 633 So.2d 1006 (Miss.1994) for the proposition that:
When there exists a conflict between expert scientific testimony and fact testimony, the trier of fact must ascertain the relative weight of each. As a universal practice, proof of facts weighs more heavily than contrary opinions thereto. Opinion evidence has little probative value when placed in strife with physical facts and, consequently, opinion evidence should not be viewed as enough to establish a conflict in the evidence.
Id. at 1010. However, Drs. Nowicki, Smith and Alexander noticed the bulge in Moffett's MRI of his lumbar spine and were of the opinion that, in the words of Dr. Alexander, "no surgery would avail him any relief." Additionally, Dr. Alexander reviewed the results of the discogram and testified that they buttressed the decision not to have surgery. The fact that Dr. Molleston found herniation does not negate the other physicians' opinions or, under the facts presented, prove, in and of itself, that the surgery was reasonable and necessary.
II. WHETHER THE COMMISSION ERRED IN HOLDING THAT MOFFETT DOES NOT SUFFER FROM PERMANENT PARTIAL DISABILITY AND WAS NOT ENTITLED TO TEMPORARY TOTAL DISABILITY BENEFITS.
¶ 20. Moffett next argues that if this Court determined that the Commission erred in finding that the surgery performed by Dr. Molleston was not reasonable and necessary, the administrative judge's finding of permanent partial disability should be affirmed. Having determined that the Commission did not err in finding that Moffett's surgery was not reasonable and necessary, this issue is moot.
¶ 21. THE JUDGMENT OF THE CIRCUIT COURT OF JONES COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
NOTES
[1] The untimeliness of the administrative judge's order is attributable to the record being left open so a second deposition of Dr. Alexander could be taken and submitted into evidence.
[2] As Moffett's last issue concerns the standard of review this Court must employ in addressing his remaining issues, it will be considered simultaneously with his first issue.