990 So.2d 191 (2007)
METALLOY CORPORATION, Appellant
v.
James GATHINGS, Appellee.
No. 2006-WC-01627-COA.
Court of Appeals of Mississippi.
September 4, 2007.
Rehearing Denied January 22, 2008.
Certiorari Granted April 17, 2008.
Certiorari Dismissed as Improvidently Granted September 4, 2008.
*192 David B. McLaurin, Tupelo, Michael Anthony Williams, Jackson, attorneys for appellant.
Jeffery M. Navarro, Aberdeen, attorney for appellee.
Before LEE, P.J., IRVING, CHANDLER and ROBERTS, JJ.
ROBERTS, J., for the Court.

STATEMENT OF THE CASE
¶ 1. This workers' compensation action arose when James Gathings injured his left eye while working for Metalloy Corporation. Following his injury and eventual loss of sight in his left eye, Gathings filed his petition to controvert. He was initially denied benefits after a hearing in front of *193 the administrative law judge. However, upon appeal to the Full Commission this decision was reversed. Subsequent to the circuit court affirming the decision of the Commission, Metalloy brought the instant appeal. Finding no error, we affirm.

FACTS
¶ 2. Gathings was employed by Metalloy when he suffered an admittedly compensable injury to his left eye on September 25, 2001.[1] Specifically, Gathings worked at a Metalloy factory in Verona, Mississippi that primarily produced manifolds used in the automobile industry. While working on a machine that utilized sand in the production of the manifolds, the machine malfunctioned and threw sand on Gathings. As a result of his supervisor's attempt to blow the sand off, some sand was blown into Gathings's left eye. Gathings returned to Metalloy approximately a month later, but would later resign in April 2002. However, this was not the first injury to Gathings's left eye.
¶ 3. Dr. William Brawner testified through deposition on November 21, 2002. He first saw Gathings on March 22, 2000, for complaints of changes in vision and eye pain. On November 17, 2000, he saw Gathings again after conditions at work began to further affect his eyesight. Dr. Brawner found that Gathings had light vision[2] only and retinal detachment in his left eye. Dr. Brawner referred Gathings to a retinal specialist who performed surgery to repair the retina in November of 2000. Following his accident on September 25, 2001, Gathings again saw Dr. Brawner on October 1, 2001, and complained of left eye pain stemming from the accident in question in which a machine he was working on exploded and caused sand to get in both eyes. During this evaluation, Dr. Brawner noted Gathings's retina seemed to be repaired. However, visual acuity of the left eye remained at light vision only. Dr. Brawner diagnosed Gathings with an iritis of the left eye, which is an inflamation of the eye, and prescribed antibiotic and steroid drops. Gathings was not placed under any work restrictions as a result of this injury. Dr. Brawner would next see Gathings on February 20, 2002. Gathings complained that smoke and fumes from work on February 12, 2002, caused him to see flashes and floaters[3] in his right eye. Dr. Brawner diagnosed Gathings's right eye with allergic conjunctivitis, and noted that his left eye vision remained unchanged from his last visit, but no iritis was noted at this point. Additionally, Dr. Brawner stated he did not see any permanent damage in the left eye as a result. Dr. Brawner last saw Gathings on April 24, 2002. Though this exam was primarily focused on his right eye, Dr. Brawner did note that there was no light perception in Gathings's left eye or, in other words, that he had lost all sight in his left eye.
¶ 4. Dr. Seth Yoser, Gathings's other treating physician, testified through deposition on May 27, 2003. Upon referral from Dr. Brawner, a colleague of Dr. Yoser, he first saw Gathings on November 18, 2000, and confirmed retinal detachment in his left eye. Following Gathings's *194 successful retina attachment surgery on November 21, 2000, he would have a recurrent retinal detachment and a second surgery on December 26, 2000. At the conclusion of a follow up visit on December 27, 2000, Dr. Yoser's prognosis of visual recovery of Gathings's left eye was guarded. During the next visit, Dr. Yoser noted that Gathings's vision in his left eye was hand motion[4] only and left eye pressure was on the low side at six. Dr. Yoser next saw Gathings on June 13, 2001, which was the day after a third surgery was performed on his left eye. His prognosis at this point concerning visual recovery of Gathings's left eye was extremely guarded. Dr. Yoser next noted that during a July 2, 2001 visit, Gathings's left eye vision was still at a hand motion level and his pressure was still low at six. However, on November 1, 2001, his pressure was within normal range. Gathings was next seen on February 26, 2002, at which time Dr. Yoser noted that he had lost all vision in his left eye. Further detail of Dr. Yoser's testimony will be disclosed below, as needed.

PROCEDURAL HISTORY
¶ 5. Gathings filed his petition to controvert on March 22, 2002, alleging he was blind in his left eye as a result of the injury sustained on September 25, 2001. Following Metalloy's answer, a hearing was held on February 16, 2005. After hearing the live testimony of Gathings and Bruce Brawner, a vocational expert, and reviewing the depositions of Drs. Brawner and Yoser, as well as other exhibits and affidavits, the administrative law judge (ALJ) found that Gathings failed to prove by a preponderance of the evidence that he suffered any temporary or permanent disability as a result of the September 25, 2001 injury. Unsatisfied with this result, Gathings appealed to the Full Commission. The Commission heard Gathings's appeal on December 19, 2005, and reversed the decision of the ALJ in a March 30, 2006 order. After reviewing the evidence and testimony before it, the Commission stated that,
Mr. Gathings himself testified credibly that his September 25, 2001 injury led directly to his complete loss of vision. This claim is fully supported by the competent testimony of Dr. Yoser who stated that Mr. Gathings' injury and resulting iritis could have indeed caused his already diminished vision to disappear completely.
Metalloy then appealed the order of the Commission to the Circuit Court of Lee County. The circuit court subsequently affirmed the decision of the Commission and denied Metalloy's motion to reconsider. This appeal followed.

ANALYSIS
¶ 6. Our standard of review concerning appeals from a decision of the Mississippi Workers' Compensation Commission is clear.
It is well settled in this state that the Mississippi Worker's Compensation Commission is the ultimate fact-finder in cases of this kind. Smith v. Jackson Constr. Co., 607 So.2d 1119, 1123-24 (Miss.1992). The Commission is also the ultimate judge of the credibility of witnesses. Miller Transporters, Inc. v. Guthrie, 554 So.2d 917, 918 (Miss.1989). Consequently, this Court must defer to decisions by the Commission on issues of fact and credibility unless the Commission commits prejudicial error. Smith, *195 607 So.2d at 1124. Further, neither this Court nor the Mississippi Supreme Court is empowered to determine where the preponderance of the evidence lies when the evidence is conflicting. Id. Instead, this Court must affirm the decision of the Commission where substantial credible evidence supports the Commission's order. Id.

This Court is bound by the decision of the Mississippi Workers' Compensation Commission if the Commission's findings of fact are supported by substantial evidence... Stated differently, this Court will reverse the Commission's order only if it finds that order clearly erroneous and contrary to the overwhelming weight of the evidence. A finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act.
Barber Seafood, Inc. v. Smith, 911 So.2d 454(¶ 27) (Miss.2005).

I. WHETHER THE COMMISSION ERRED IN FINDING THAT GATHINGS WAS ENTITLED TO PERMANENT PARTIAL DISABILITY BENEFITS.
¶ 7. The claimant bears the burden to prove by a preponderance of the evidence each element of a claim of disability. Harrell v. Time Warner/Capitol Cablevision, 856 So.2d 503(¶ 7) (Miss.Ct.App. 2003). Specifically, in order to establish entitlement to workers' compensation benefits, the claimant must prove: (1) an accidental injury, (2) arising out of and in the course of employment, and (3) a causal connection between the injury and the claimed disability. Id. Additionally, "a pre-existing condition is not always a bar to recovery for a disability. Rather, if the employment aggravated, accelerated, or combined with the pre-existing condition to produce the disability, the disability arose out of the employment and the claimant is entitled to compensation for the disability." Id.
¶ 8. Metalloy argues that Gathings failed to meet this burden, and the Commission erred in finding otherwise as, so Metalloy argues, the Commission's decision that a causal connection between the work-related accident and Gathings's loss of sight was not supported by substantial evidence. In support of this Metalloy cites Harrell, 856 So.2d at 503. In Harrell, the claimant fell at work in June 1994. Id. at (¶ 4). In March 1996 she was diagnosed with interstitial cystitis, and in 1998 she filed her petition to controvert claiming, among other injuries, a work-related injury to her lower back which she claimed caused her urological condition. Id. at (¶¶ 3, 11). The administrative law judge found that Harrell failed to prove by a preponderance of the evidence that her compensible back injury caused or contributed to the interstitial cystitis. Id. at (¶ 4). The Commission affirmed the decision of the ALJ; however, the circuit court subsequently reversed the decision. Id. at (¶ 5).
¶ 9. During the hearing in front of the ALJ, Harrell testified about two prior non-work-related back injuries that required surgery. Id. at (¶ 13). Dr. Charles Secrest stated in his deposition that there was no known cause for interstitial cystitis, but anything related to her back injuries could have had an impact on the development of her interstitial cystitis. Id. at (¶ 25). However, he stated it was impossible to say which event led to the disorder. Id. Dr. John Aldridge similarly testified through deposition that he was unable to say to any degree of medical certainty whether Harrell's interstitial cystitis was *196 related to any work-related back injury. Id. at (¶ 26).
¶ 10. In reversing the decision of the circuit court, we reasoned that the Commission's decision was supported by substantial evidence. Id. at (¶ 25). While Drs. Secrest and Aldridge testified that a back injury could have been a factor in the development of Harrell's condition, they were unable to testify to a reasonable degree of medical certainty that Harrell's June 1994 fall caused or contributed to the interstitial cystitis. Id. We stated that "the inability of any expert ... to state that there was anything more than a possibility that the work-related injury caused or contributed to the interstitial cystitis" supported the Commission's decision as "recovery ... must rest upon reasonable probabilities, not upon mere possibilities." Id. at (¶ 30) (citing Burnley Shirt Corp. v. Simmons, 204 So.2d 451, 454 (Miss.1967)).
¶ 11. While there are similarities between Harrell and the case sub judice, Harrell is not directly on point. The expert testimony in Harrell made clear that there was no known cause for interstitial cystitis, and, while a back injury could cause the condition, there was no way to know if Harrell's work-related fall caused or contributed to it. In the case before us, Dr. Yoser similarly could not state with any reasonable degree of medical certainty what exactly caused Gathings's vision to fail; however, he testified that the trauma Gathings experienced on September 25, 2001, and the resultant iritis, could have caused Gathings's loss of vision in his left eye. Further, Dr. Yoser stated that considering someone in Gathings's position, the iritis "may have been all that was necessary to push him over the edge from hand motion to no light perception." While a statement such as it "could have caused" the injury typically only amounts to an expression of possibility insufficient to show causation, see Scott County Co-op v. Brown, 187 So.2d 321, 326 (Miss.1966), Dr. Yoser also stated that he knew of no other cause in Gathings's medical history that to a reasonable degree of medical certainty would have led to the diminution of Gathings's sight other than the trauma experienced as a result of the work-related accident of September 25, 2001. We find that, based upon Dr. Yoser's testimony, the decision of the Commission is supported by substantial evidence.
¶ 12. The dissent argues that the Commission erred in relying on Dr. Yoser's testimony as "[he] failed to give a definite opinion as to a causal connection between the injury and loss of vision. At best, he testified to a mere possibility, which was in conflict with his prior testimony as to other possible causes explaining the loss of vision." However, the question we must ask is "[f]rom the whole of the doctor's testimony, what is the real substance he stated concerning causal connection?" Airtran, Inc. v. Byrd, 953 So.2d 296(¶ 5) (Miss.Ct.App.2007) (quoting Dixie Contractors, Inc. v. Ashmore, 349 So.2d 532, 534 (Miss.1977)). We should not be concerned with the recitation of certain "magic words," but focused upon "the real substance of what the witness intended to convey...." Airtran, Inc., 953 So.2d at 299(¶ 5) (quoting Dixie Contractors, Inc., 349 So.2d at 533).
¶ 13. Dr. Yoser did testify to other ailments that could cause a loss of sight, but later noted that Gathings did not exhibit any of those causes. Specifically, Dr. Yoser was asked:
Q. What other factors affect loss of vision afterafter an incident like,after surgeries and incidents
A. Right.
Q.  like that?

*197 A. I mean some people fail to see after surgery because the eye just doesn't recover. It happens. Some people fail because of secondary glaucoma because of inflammations like in iritis, because of infections like endophthalmitis, because of nerve damage that occurs by factors I'm not even sure anyone's aware of. So there's a whole list that could be possible.
During redirect examination, Dr. Yoser further clarified this statement with the following exchange:
Q. The September 28th trauma to Mr. Gathings' eye that he claims that he experienced and the iritis may medically have caused this lingering effect that you noted in February 26th that he was then unable to perceive light
A. That is correct.
Q. is that right? All right. And there are other medical explanations such as glaucoma or other causes. You don't note those with Mr. Gathings?
A. That is correct. I didn't see evidence of that.
....
Q. Are you aware of any other medical explanations for the cause of
A. I'm not
Q. Mr. Gathings
A. aware of any other medical explanations as to Mr. Gathings losing the rest of his vision.
....
Q. You know of no other medicaldo you know of any other medical cause other than the September 28th, 2002, trauma that Mr. Gathings claims that he experiences and the resultant iritis that he experienced that would, in your opinion to a reasonable degree of medical probability or certainty, have cause this diminution in Mr. Gathings' vision?
A. Right, I know of no other cause. And, actually, the year is 2001.
It is a common experience of compensation and personal injury lawyers to find that the more distinguished a medical witness is, the more tentative and qualified are his or her statements on the witness stand.... The weight of such testimony, however, should not be too sharply discounted because of the disposition of the highly trained scientific mind to refrain from unqualified statements or opinions on such matters as causation.
8 Larson's Workers' Compensation Law § 130.06(2)(a) (2006). While it is clear from the above testimony, and from Dr. Yoser's testimony throughout his deposition, that he was not prepared to say that the sand blown into Gathings's eye on September 25, 2001, was definitely the sole cause of Gathings's subsequent loss of sight, he testified to a reasonable degree of medical certainty that there were no other causes of Gathings's blindness. Under the facts before us, such testimony is enough to sustain the Commission's decision.
¶ 14. Metalloy also argues that the Commission erroneously relied upon Gathings's own layman testimony that he lost his sight in his left eye as a result of the September 25, 2001 accident. While this testimony would not be sufficient to prove a causal connection between the accident and Gathings's loss of sight, as noted above, this was not the only testimony the Commission relied on in reaching its decision. As previously stated, Dr. Yoser's expert testimony provided the substantial evidence required for this Court to affirm the decision of the Commission.
*198 ¶ 15. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR. CARLTON, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES, J.
CARLTON, J., Dissenting:
¶ 16. I respectfully dissent. I would reverse the Commission's order and the circuit court because the findings are clearly erroneous and against the overwhelming weight of the evidence.
¶ 17. The evidence is uncontroverted and overwhelming that Mr. Gathings suffered pre-existing vision problems, had a detached retina, and three eye surgeries prior to the unrelated injuries. Dr. Seth Yoser, Mr. Gathings's treating ophthalmologist, testified that he was of the opinion that since Gathings had three previous surgeries, his left eye failed. The surgeries pre-dated the work injury in issue. The Commission's findings and the circuit court's are erroneous because they failed to show or prove causal connection of Gathings's current vision loss to the work-related injury.
¶ 18. Our review of workers' compensation cases is limited to a determination of whether the Commission's findings of fact and order are supported by substantial evidence. Marshall Durbin Cos. v. Warren, 633 So.2d 1006, 1009 (Miss.1994); Fleming Enterprises, Inc. v. Henderson, 741 So.2d 309, 313(¶ 15) (Miss.Ct.App. 1999). Substantial evidence, "though not easily defined," is evidence "affording a substantial basis of fact from which the fact in issue can be reasonably inferred." Page v. Zurich Amer. Ins. Co. of Ill., 825 So.2d 721, 723(¶ 3) (Miss.Ct.App.2002) (citing Attala County Nursing Ctr. v. Moore, 760 So.2d 784, 788(¶ 8) (Miss.Ct.App. 2000)).
¶ 19. The claimant bears the burden of proving entitlement to benefits by a preponderance of the evidence as to each element of the claim. Harrell v. Time Warner/Capitol Cablevision, 856 So.2d 503, 506(¶ 7) (Miss.2003) (citing Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 12 (Miss. 1994)). This includes (1) an accidental injury, (2) arising out of and in the course of employment, and (3) a causal connection between the injury and the claimed disability. Id. There is no dispute that Gathings suffered a work-related injury, but I am not convinced that the testimony of Dr. Yoser provides substantial evidence of the causal connection between the injury and the disability. As this Court has stated: "It is well-established that recovery under the workers' compensation scheme must rest upon reasonable probabilities, not mere possibilities." Harrell, 856 So.2d at 511(¶ 30) (citing Burnley Shirt Corp. v. Simmons, 204 So.2d 451, 454 (Miss.1967)).
¶ 20. In his deposition testimony, Dr. Yoser testified as follows:
Q. And based on a reasonable degree of medical certainty, you cannot state that based upon assuming that these matters are true regarding the visual acuity not changing during that time, based on a reasonable degree of medical certainty, you cannot state that the iritis in Octoberon Octoberin October was the cause of him losing his vision in February?
A. Right. I'm not sure that I can state with any reasonable degree of medical certainty what exactly caused his vision to decline from the hand motion level to the no light perception level, February 20th, 2002, with Dr. Brawner's testimony *199 and my physical visit with Mr. Gather  Gathings on February 26th of 2002 except that I confirmed that the no light perception was present still in a re-evaluation of Mr. Gathings on October 11th of 2002. So all I know for a fact is that Mr. Gathings lost all vision in his left eye.
Q. And we don't know why?
A. We're going to presume that based on his retinal detachments his eye has subsequently failed to see.
¶ 21. Contrary to the majority's statement, Dr. Yoser testified as to other possible causes of the loss of sight:
A. I mean that some people fail to see after surgery because the eye just doesn't recover. It happens. Some people fail to see because of secondary glaucoma, because of inflammation like iritis, because of infections like endophathalmitis, because of nerve damage that occurs by factors I'm not sure anyone's aware of. So there's a whole list that could be possible.

(emphasis added).
¶ 22. The findings of the administrative law judge included the following:
The Claimant has failed to prove by a preponderance of the evidence that he suffered any temporary or permanent disability as a result of the September 28, 2001, injury and resultant iritis. In regard to the issue of temporary disability, neither Dr. Brawner nor Dr. Yoser took claimant off work or restricted his work during the period of treatment. In regard to the issue of permanent disability, the undersigned points particularly to the fact that neither Dr. Brawner nor Dr. Yoser opined to a reasonable degree of medical certainty that the iritis, resulting from the subject accident, was the cause of claimant's loss of left eye vision. As such, although claimant does have permanent work restrictions as a result of the loss of left eye vision the medical testimony does not support his allegation that the iritis was the cause of this condition.
. . . .
Although Dr. Brawner noted that as of February 20, 2002, claimant retained light perception in the left eye, by February 26, 2002, claimant had lost all vision in this eye and Dr. Yoser testified that this change in visual acuity could have occurred between February 20, 2002 and February 26, 2002. Further, he testified that he could not state to a reasonable degree of medical certainty that the iritis of October 2001 was the cause of the visual decline in claimant's left eye. Although he later testified that the iritis could have affected claimant's left eye visual acuity, he testified that his prior testimony that he could not state within a reasonable degree of medical certainty remained unchanged.
¶ 23. The order of the Commission erroneously states that Mr. Gathings's testimony that his vision loss was caused or contributed to by his work injury is "fully supported by the competent testimony of Dr. Yoser who stated that Mr. Gathings's injury and resulting iritis could have indeed caused his already diminished vision to disappear completely." (emphasis added). Under the Commission's view, a claimant's testimony supported by a mere medical possibility is sufficient to prove a causal connection. I would find that this was error on the part of the Commission and reverse its decision.
¶ 24. The Workers' Compensation Commission committed a clear error of law in finding that there was substantial evidence of a causal connection between Gathings's work-related injury and his subsequent loss of vision in his left eye. The majority opinion submits that we should be concerned *200 only with the "substance" of the testimony that the witness intended to convey. It is apparent that the substance of Dr. Yoser's testimony was that he did not know what caused Gathings's diminution of sight particularly considering his pre-existing medical history and surgeries. Dr. Yoser failed to give a definite opinion as to a causal connection between the injury and the loss of vision. At best, he testified to a mere possibility, which was in conflict with his prior testimony as to other possible causes explaining the loss of vision. Consequently, I dissent and would reverse the decisions of the Commission and the circuit court.
BARNES, J., JOINS THIS SEPARATE OPINION.
NOTES
[1] There is some confusion over the actual date of injury within the record. At times it is listed as September 28, 2001, while other times it is listed as September 25, 2001. As the specific date of injury is not pertinent to the issue raised, we will refer to it as September 25, 2001.
[2] An individual with sight limited to light vision only is only able to discern light from darkness.
[3] Flashes, as the name implies, are actual sensations of light in the eye. Floaters are small dark spots within one's vision.
[4] Hand motion means that the vision is limited to the point where the patient is only able to discern shadows from movement.