# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-WC-01041-COA

**THE KROGER COMPANY AND KROGER LIMITED PARTNERSHIP I**                                    **APPELLANTS**

**v.**

**KATHY PYBUS**                                    **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 09/02/2020 |
| TRIBUNAL FROM WHICH APPEALED: | MISSISSIPPI WORKERS' COMPENSATION COMMISSION |
| ATTORNEYS FOR APPELLANTS: | CLIFFORD B. AMMONS |
| | CLIFFORD BARNES AMMONS JR. |
| ATTORNEYS FOR APPELLEE: | ROGER K. DOOLITTLE |
| | FLOYD E. DOOLITTLE |
| NATURE OF THE CASE: | CIVIL - WORKERS' COMPENSATION |
| DISPOSITION: | AFFIRMED - 09/28/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., GREENLEE AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Kathy Pybus, a fifty-six-year-old grocery clerk with The Kroger Company (Kroger), suffered a work-related injury to her pelvis. After Pybus filed a workers' compensation claim, the Mississippi Workers' Compensation Commission (Commission) ultimately found that Pybus sustained a loss of wage-earning capacity. The Commission awarded Pybus partial permanent disability benefits.

¶2.     Kroger[1] now appeals the Commission's decision, arguing that the Commission failed

---

[1] The Appellants in this case are The Kroger Company (Pybus's employer) and Kroger Limited Partnership I, the insurer for The Kroger Company. For purposes of clarity,

to provide the required analysis in determining loss of wage-earning capacity and that the Commission erred by relying only on the factor of loss of access when evaluating Pybus's loss of wage-earning capacity. After our review, we find that the Commission's decision was supported by substantial evidence. We therefore affirm.

## FACTS

¶3. On May 26, 2015, while cleaning a restroom at Kroger, Pybus was knocked to the floor by a customer entering the restroom. Pybus's fall resulted in an injury to her pelvis. Pybus was treated by Dr. George Russell, an orthopedic surgeon, and she reached maximum medical improvement (MMI) on May 23, 2017. After undergoing a functional-capacity-evaluation test (FCE), Dr. Russell released Pybus to return to light duty work. On August 21, 2017, Pybus returned to her employment at Kroger as a grocery clerk.

¶4. Pybus filed a workers' compensation claim against Kroger. The administrative judge (AJ) held a hearing to determine the issue of whether Pybus suffered a permanent disability as a result of her May 26, 2015 injury. At the hearing, the AJ heard testimony from the following: Pybus; James Smith, the store manager at the Kroger location where Pybus worked; and Kathy Smith and Angela Malone, vocational rehabilitation experts who each conducted a vocational assessment of Pybus. The parties also submitted the following evidence: Dr. Russell's deposition; Pybus's medical records from MediComp, Methodist Rehabilitation Center, and the University of Mississippi Medical Center; a light-duty task

we will refer to the Appellants as "Kroger."

2

report; the vocational evaluation reports from the two vocational experts; the FCE questionnaire and letter completed by Dr. Russell; a copy of Pybus's job description; and the set union wages for grocery clerks. The record also shows that both Kroger and Pybus stipulated to the following: on May 26, 2015, Pybus was injured in the course and scope of her employment at Kroger; Pybus's average weekly wage at the time of injury was $562.40; and Pybus reached MMI on May 23, 2017.

¶5. On June 21, 2019,[2] the AJ entered an order denying Pybus's claim for permanent disability benefits. The AJ found that "a preponderance of the credible evidence shows that Ms. Pybus can perform the substantial acts of her usual employment," and the AJ therefore held that the evidence did not support a finding of a permanent disability. The AJ also found that evidence failed to support a loss of wage-earning capacity because Pybus's post-injury wages exceeded her pre-injury wages.

¶6. Pybus filed a petition for review with the Commission. Upon review, the Commission found that although Pybus's post-injury wages exceeded her pre-injury wages, Pybus provided evidence to successfully rebut the presumption of no loss of wage-earning capacity. The Commission therefore reversed the AJ's decision and remanded the case to the AJ with instructions to determine Pybus's loss of wage-earning capacity.

¶7. In its order, the Commission acknowledged that Pybus's injury resulted in surgery and

---

[2] The AJ entered an amended order on July 2, 2019, to correct errors regarding the parties' stipulations.

3

the assignment of permanent work restrictions of light to medium duty. The Commission found that Pybus was limited in her abilities to lift, sit, walk, and stand. Regarding whether Pybus received accommodations from Kroger and if these accommodations affected Pybus's wage-earning abilities on the open market, the Commission found that based on the evidence presented, "[Pybus] is receiving accommodations from [Kroger] that may not be afforded to [Pybus] on the open labor market." The Commission ultimately held that "[b]ased on the evidence as a whole including, but not limited to, [Pybus's] work accommodations, age, permanent restrictions, and continued complaints of pain, we find that [Pybus's] post-injury wages are an unreliable indicator as to [her] wage-earning capacity."

¶8. The Commission further found that the AJ erred by utilizing the standard for determining the loss of industrial use to a scheduled member instead of utilizing the standard for determining an injury to the body as a whole. The Commission explained that "[w]here, as here, [Pybus] has suffered an injury to the body as a whole, the appropriate standard for determining permanent disability is [Pybus's] loss of wage-earning capacity." The Commission instructed the AJ, upon remand, to consider the factors set forth in *Guardian Fiberglass Inc. v. LeSueur*, 751 So. 2d 1201, 1204-05 (¶10) (Miss. Ct. App. 1999), for determining Pybus's loss of wage-earning capacity, if any:

> (1) an increase in general wage levels, (2) increased maturity or training, (3) longer hours worked, (4) sympathy wages, (5) temporary and unpredictable character of post injury earnings, (6) his inability to work, (7) his failure to be hired elsewhere, and (8) the continuance of pain and any other related circumstances.

4

¶9.    On remand, the AJ entered an order finding that Pybus successfully rebutted the presumption that she sustained no loss of wage-earning capacity.  The AJ acknowledged that Pybus returned to work earning a higher hourly wage and higher gross wages per week than her pre-injury wages; however, the AJ found that "Pybus has shown that her actual post-injury wages are an unreliable indicator of her post-injury wage-earning capacity."  The AJ explained that the evidence showed that Kroger accommodated Pybus due to her post-injury restrictions, stating:

> Pybus is limited in her abilities to lift as well as sit, walk, and stand. [Pybus] has been released to perform light to medium duty, which [Kroger] has accommodated.  Ms. Pybus is able to work at her own pace and she has made her own adjustments to perform her job duties.  As stated, she is not asked to lift heavy objects, such as dog food, that other workers in her position may be required to lift.

The AJ also recognized that Pybus's FCE result restricted her to a light range level of work.

¶10.    The AJ determined that based on the testimony and evidence presented, Pybus "suffered a loss of wage-earning capacity to the body as a whole of thirty (30) percent."  The AJ therefore found that Pybus was entitled to permanent partial disability benefits from May 23, 2017, and continuing for 450 weeks.  Kroger filed a petition for review, and Pybus filed a cross-petition for review.

¶11.    Upon review, the Commission entered an order on August 17, 2020,[3] affirming the AJ's decision that Pybus sustained a permanent loss of wage-earning capacity and was

---

[3] The Commission entered an amended order on September 2, 2020, to correct a clerical error.  *See infra* note 4.

entitled to permanent partial disability benefits. The Commission amended the AJ's order to state that Pybus "sustained a loss of wage-earning capacity in the amount of $142.14 per week beginning May 23, 2017, and continuing for 450 weeks." However, the Commission held that the AJ failed to provide an analysis to support her finding that Pybus suffered a thirty percent loss of wage-earning capacity and failed to use the correct method of calculation of loss of wage-earning capacity.

¶12. In its order, the Commission provided the following analysis in support of its award of benefits to Pybus:

> [Pybus's] stipulated pre-injury average weekly wage is $562.40. The Commission finds that [Pybus] presented evidence of her post-injury wages on the open labor market through the testimony of vocational expert, Kathy Smith. Ms. Smith opined that [Pybus] had suffered a loss of access on the open labor market due to her post-injury restrictions, her age, job history, and transferrable skills. Ms. Smith testified that [Pybus's] job prospects on the open labor market, given [Pybus's] age and restrictions, are limited. Ms. Smith opined that [Pybus's] post-injury wage-earning capacity on the open labor market equals an average wage of $8.73 per hour (multiplying by forty (40) hours equals $349.20 per week).

¶13. The Commission noted that another vocational expert, Angela Malone, also testified that Pybus was working for Kroger in an accommodated position. The Commission stated that Malone "listed only sedentary or light duty jobs as examples of suitable positions for [Pybus], despite the fact that some of [Pybus's] pre-injury jobs had been medium or heavy duty." The Commission acknowledged that Malone did not provide any testimony regarding the post-injury wages Pybus could earn on the open labor market. The Commission determined that "Malone's testimony thus indicates that [Pybus] has suffered a loss of access

6

to the job market because of her work-related injury." The Commission accordingly held that "based on the above and the evidence as a whole, we find that [Pybus] sustained a loss of wage-earning capacity in the amount of $142.14 ($562.40 - $349.20 = $213.20 x 0.6667 = $142.14)."[4]

¶14. Kroger now appeals.[5]

## STANDARD OF REVIEW

¶15. The Commission is the ultimate fact-finder in a workers' compensation case, and

---

[4] Mississippi Code Annotated section 71-3-17(c)(25) (Supp. 2012) states that the compensation for permanent partial disability "shall be sixty-six and two-thirds percent . . . of the difference between [her] average weekly wages . . . and [her] wage-earning capacity thereafter . . . ." After the Commission entered its order, Pybus filed a motion to correct a scrivener's error in the order; specifically, to correct a mathematical calculation. The Commission's original order set forth the following incorrect equation regarding Pybus's loss of wage-earning capacity: "($562.40-$213.20 X 0.6667=$142.14)." In response to Pybus's motion, the Commission amended its order on September 2, 2020, to correct the error, and the correct equation is set forth in the body of this opinion.

[5] In her appellate brief, Pybus argues that Kroger improperly appeals from the Commission's August 17, 2020 order, rather than the Commission's September 2, 2020 amended order. Pybus asserts that the Commission's August 17, 2020 order was not final, and therefore Kroger's notice appealing from the August 17, 2020 order is interlocutory and should be dismissed. The record reflects that on August 18, 2020, Pybus filed a motion to correct a scrivener's error in the Commission's August 17, 2010 order—specifically, an error in the mathematical calculation regarding Pybus's loss of wage-earning capacity. On September 2, 2020, the Commission entered its amended order correcting the mathematical calculation regarding Pybus's wage-earning capacity. Kroger filed its notice of appeal on September 15, 2020, stating that it was appealing from the Commission's August 17, 2020 order. Our review of the August 17, 2020 order and the September 2, 2020 amended order shows that the only difference between the two orders was the correction of the equation to determine Pybus's loss of wage-earning capacity. Both orders state that Pybus sustained a loss of wage-earning capacity in the amount of $142.14. We therefore find no merit to Pybus's argument that Kroger's appeal is interlocutory.

"decisions by the Commission on issues of fact and credibility" must be given deference. *Imperial Palace Casino v. Wilson*, 960 So. 2d 549, 552 (¶9) (Miss. Ct. App. 2006). We will affirm the decision of the Commission "unless it lacks the support of substantial evidence, is arbitrary or capricious, is beyond the Commission's scope or its power, or violates constitutional or statutory rights." *Seals v. Pearl River Resort*, 301 So. 3d 585, 587 (¶5) (Miss. 2020) (internal quotation marks omitted). The Mississippi Supreme Court has explained that "[f]or a decision to be supported by substantial evidence, the underlying evidence must provide 'a substantial basis of fact from which the fact in issue can be reasonably inferred.'" *Id*. at 587-88 (¶5). Conversely, "[a] finding is clearly erroneous when, although there is some slight evidence to support it . . . on the entire evidence[, the reviewing court] is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act." *Barber Seafood Inc. v. Smith*, 911 So. 2d 454, 461 (¶27) (Miss. 2005).

¶16. "[D]ecisions as to loss of wage-earning capacity are largely factual and are to be left largely to the discretion and estimate of the [C]ommission." *Neshoba Cnty. Gen. Hosp. v. Howell*, 999 So. 2d 1295, 1298 (¶8) (Miss. Ct. App. 2009) (internal quotation marks omitted). The Commission's application of law, however, is reviewed de novo. *Spann v. Wal-Mart Stores Inc.*, 700 So. 2d 308, 311 (¶12) (Miss. 1997).

## DISCUSSION

¶17. On appeal, Kroger argues that the Commission erred by failing to provide the required

detailed findings of fact and application of law in support of its decision that Pybus suffered a permanent loss of wage-earning capacity. Kroger explains that the Commission used "loss of access" as the sole determinative factor for loss of wage-earning capacity, rather than viewing the evidence as a whole. Kroger also asserts that the Commission failed to take into consideration the vast majority of the evidence. As a result, Kroger maintains that the Commission's findings and decision were not supported by substantial evidence.

¶18. Mississippi Code Annotated section 71-3-7(1) (Supp. 2012) provides for compensation to an employee "for disability . . . from injury . . . arising out of and in the course of employment, without regard to fault as to the cause of the injury . . . ." "Disability" is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings." Miss. Code Ann. § 71-3-3(i) (Rev. 2011). "'[D]isability' consists of two elements—an actual physical injury and the loss of wage-earning capacity." *Pruitt v. Howard Indus. Inc.*, 232 So. 3d 822, 825 (¶9) (Miss. Ct. App. 2017) (citing *Gregg v. Natchez Trace Elec. Power Ass'n*, 64 So. 3d 473, 476 (¶10) (Miss. 2011)). Pybus, as the claimant, "bears the burden of proof of disability and the extent thereof." *Id*.

¶19. In cases like the one before us, where a "claimant returns to [her] same or similar employment and earns the same or higher wages," a rebuttable presumption of no loss of wage-earning capacity arises. *Id.* at 825 (¶10); *Gregg*, 64 So. 3d at 476 (¶12). The supreme

court has held that a claimant can rebut this presumption by presenting evidence that

> the post-injury earnings are unreliable due to: increase in general wage levels since the time of accident, claimant's own greater maturity and training, longer hours worked by claimant after the accident, payment of wages disproportionate to capacity out of sympathy to claimant, and the temporary and unpredictable character of post-injury earnings.

*Gen. Elec. Co. v. McKinnon*, 507 So. 2d 363, 365 (Miss. 1987). We recognize that "this list is certainly not an exclusive one." *Id.* The supreme court has further stated that "any factor or condition which causes the actual post-injury wages to become a less reliable indicator of earning capacity will be considered[,]" including the claimant's inability to work, continuing pain, and loss of access to the job market. *Id.*; *see also Weathersby v. Miss. Baptist Health Sys. Inc.*, 195 So. 3d 877, 883 (¶25) (Miss. Ct. App. 2016); *Guardian Fiberglass*, 751 So. 2d at 1204-05 (¶10). A determination as to a claimant's loss of wage-earning capacity "should be made only after considering the evidence as a whole." *Neshoba Cnty. Gen. Hosp.*, 999 So. 2d at 1300 (¶16).

¶20. As stated by the Commission, Pybus's post-injury wages exceeded her pre-injury wages, and therefore a rebuttable presumption of no loss of wage-earning capacity arises in this case. To rebut this presumption, Pybus bears the burden of providing evidence that her post-injury earnings are unreliable.

¶21. Our review of the record shows that Pybus's orthopedic surgeon, Dr. Russell, testified via deposition that he treated Pybus after her injury. Dr. Russell diagnosed Pybus with a left parasymphyseal fracture with a nonunion. On August 29, 2016, Dr. Russell performed

surgery on Pybus to repair her fracture. During a follow-up visit in March 2017, Dr. Russell recommended that Pybus gradually return to more of her normal activities. Dr. Russell explained that for an injury like Pybus's, "it's important to get people moving, get rid of some of the stiffness, get them more in tune with what they normally do."

¶22. The record shows that Pybus underwent an FCE on May 3, 2017. Per the May 2017 FCE results, Pybus was restricted to light duty work. Pybus reached MMI on May 23, 2017. On August 21, 2017, Pybus returned to light duty work as grocery clerk at Kroger.

¶23. Dr. Russell testified that in November 2017, Pybus complained of experiencing pain in her groin area after walking a lot at work or carrying more than twenty pounds. At another follow-up visit in March 2018, Dr. Russell noted that Pybus "was strong enough to continue to work despite the discomfort" she experienced as a result of her injury. Dr. Russell also observed that Pybus was not walking with a limp and that she had "normal, good cadence, good pace of walking." At the March 2018 visit, Dr. Russell also took x-rays and observed that Pybus's fracture had healed. Dr. Russell instructed Pybus to continue with light duty work. Dr. Russell also prescribed physical therapy for core strengthening and back strengthening, explaining that Pybus "had a lot of deconditioning from her injury and just wasn't back to her normal strength level."

¶24. Pybus returned to see Dr. Russell in May 2018. At that visit, Pybus informed Dr. Russell that she was still experiencing discomfort, but she was able to work. Dr. Russell testified that he interpreted "discomfort" to mean "normal sort of residual aches and pains."

11

Dr. Russell took more x-rays and testified that those x-rays revealed that Pybus's fracture was "healed as much as it's going to heal." As far as any potential pain that Pybus might suffer, Dr. Russell stated, "I'd imagine, based on just knowing her for a while, she's going to be a little bit achy, especially with a lot of activity." Dr. Russell stated that based on his conversations with Pybus, he felt that "she's functioning well but she gets sore with big, long walks. We all get achy as we get older." Dr. Russell also testified that based on Pybus's injury, "[he] would imagine . . . her complaints of achiness are consistent with her injury." Dr. Russell testified that over-the-counter pain medications should ease Pybus's aches.

¶25. Dr. Russell opined that Pybus is currently "completely healed," but he explained that in order for her to have restrictions changed, she would need to undergo another FCE. Dr. Russell agreed that in order to understand Pybus's current ability in the workplace, she should undergo another FCE.

¶26. After Dr. Russell's deposition, Pybus underwent another FCE on November 13, 2018. The FCE results reflected that Pybus's overall work restrictions fell within the light range "due to muscle weakness and difficulty with prolonged positions." According the FCE, Pybus could perform light duty work for an eight-hour day, forty hours a week. Specifically, Pybus could lift up to sixteen pounds from floor to waist occasionally and up to eleven pounds from waist to eye level occasionally; carry twenty-six pounds with two hands occasionally; and push up to forty-two pounds occasionally. The FCE results showed that Pybus's ability to occasionally carry twenty-six pounds and push up to forty-two pounds fell

12

into the medium level range. Dr. Russell indicated on a form that he agreed with and adopted the November 2018 FCE. Dr. Russell also wrote a letter to Kroger's claims adjuster stating that he found no reason to disagree with the November 2018 FCE findings and that he "believe[d] these [findings] will be permanent restrictions" for Pybus.

¶27. Pybus testified that before her injury, her duties as a clerk involved hanging price tags and making signs, bagging groceries, taking groceries out to vehicles, and occasionally lifting items that weighed in excess of sixteen pounds. Pybus stated that after returning to work, Kroger has allowed her to work at her own pace and that her supervisors have not asked her to do a job that requires her to lift anything over sixteen pounds. Pybus testified that when she encounters a situation that requires her to lift an item that is too heavy, she will leave the item on the pallet or dolly, and someone else will perform that duty. Pybus estimated that this happens "[p]robably weekly." Pybus also testified that she has occasionally bagged groceries post-injury, but she acknowledged that bagging groceries violates her restriction to light duty work. Pybus stated that she has not taken groceries out to a customer's vehicle since returning to work after her injury. Pybus testified that if she was ever asked to load a bag of dog food or another similarly heavy item into a vehicle, she would "have to ask a young man to help me." Pybus admitted that even prior to her injury, she would still ask for help when lifting dog food into a vehicle.

¶28. Pybus also stated that prior to her injury, she was required to be able to stand or walk for an eight-hour day. Pybus testified that after her injury, "it's a struggle for me to do an

13

eight-hour day." Pybus estimated that currently, she stands for approximately six of the eight hours that she works each day, even though her November 2018 FCE restricted her to stand for only two-and-a half hours a day. Pybus testified that when she has to stock items on the lower shelves, she sits on a milk crate.

¶29. Pybus stated that she has never seen the document admitted into evidence that listed the job description for cashiers/clerks at Kroger. Pybus agreed that if Kroger required her to comply with the job description for a clerk as set forth in the document, she would not be able to perform her job, and it would exceed her FCE restrictions.

¶30. As far as pain, Pybus testified that if she bends a lot, she experiences pain in her groin area. Pybus testified that she experiences pain every day, and the pain is worse when she works a full day. Pybus also stated that "every now and then" her pain level causes her to vomit. Pybus testified that Advil and Tylenol do not help the pain. Pybus admitted that she is not currently taking any pain medication and that she had not missed any work due to pain. Pybus stated that she complained to Dr. Russell about her pain but that he never called in any pain medication for her.

¶31. Pybus testified that she has never worked outside of the grocery industry. Pybus testified that she enjoys her job and that she intends to work at Kroger as long as she can. Pybus admitted that she had not looked for employment anywhere else since returning to work after her injury.

¶32. Kathy Smith, a vocational expert, testified that she performed an analysis of Pybus for

her loss of access to the labor market after her first FCE. Smith stated that she met with Pybus on September 27, 2017, and that she has not met with Pybus again. Smith testified after she received Pybus's second FCE, she ran an updated vocational-evaluation report based on those FCE results.

¶33. Smith testified that Pybus's restrictions from her second FCE place her in the light range of work, but she admitted that some of the items on Pybus's FCE allowed Pybus to perform medium range work. Smith described Pybus's restriction of lifting eleven pounds from waist to eye level as "almost sedentary work." Smith testified that Pybus's current FCE results eliminated her previous occupation as a grocery clerk at Kroger. Smith explained that the FCE states that Pybus can stand only on an occasional basis, which "eliminates the previous jobs that she did."

¶34. As to whether Kroger provided Pybus with any post-injury accommodations based on her FCE restrictions, Smith stated, "It sounds like she has accommodated her own position . . . , and [Kroger is] allowing her to do that." Smith stated that because Pybus has been allowed to self-accommodate her position since returning after her injury, Pybus should continue her employment with Kroger.

¶35. Smith further opined that at Pybus's age, the chances of Pybus getting another job within her FCE restrictions are "slim." Smith stated in her vocational evaluation report that because of Pybus's injury, she has lost access to one-hundred percent of the jobs that involved the same work activity in the same industries. In her report, Smith opined that

Pybus's post-injury wage-earning capacity on the open labor market amounts to an average wage of $8.73 per hour.

¶36. Angela Malone, another vocational expert, also recommended that Pybus continue her employment with Kroger "because [Pybus] seems to be happy where she's working and she's capable of doing that job." Malone prepared a vocational evaluation report and stated that Pybus's second FCE results were "most consistent with light work," but she recognized that Pybus "demonstrated the ability" to perform functions that fall "within the medium range of work."

¶37. Malone's report described Pybus's current position and duties as "modified." During her testimony about Pybus's post-injury job duties, Malone clarified, "I don't know that all of this is accommodated." Malone testified that she reviewed Dr. Russell's deposition, and she did not see a statement from Dr. Russell recommending that Pybus should not be performing in her current job. Malone opined that Pybus is still performing many of the same tasks and duties at Kroger that she performed prior to her injury.

¶38. In discussing whether Pybus suffered a loss of access to employment, Malone stated that loss of access is just one factor to examine in determining whether someone is disabled in their job. Malone did not provide an opinion as to Pybus's post-injury wage-earning capacity on the open labor market.

¶39. James Smith, the store manager at the Kroger location where Pybus works, testified regarding the duties of employees classified as clerks. James acknowledged that the

document containing the job description for the position of cashier/clerk stated that employees "may" be required to lift items as heavy as fifty pounds and that employees would be required to lift items between eleven and twenty-four pounds hourly and between twenty-six and fifty pounds daily. However, James explained that "those are guidelines" and that "in most cases, you will find that no one is lifting those on the front end [of the store] rarely." James acknowledged that Pybus could be required to lift a bag of dog food or cat litter or a case of water, but he clarified that "it's just something that we don't do."

¶40. James repeatedly denied that Kroger was accommodating Pybus in her job, and he stated that Pybus is "doing the same job now she was doing before." James clarified that if Kroger is accommodating Pybus, he was not aware of it. James confirmed that Pybus is a viable part of the work force at Kroger and a hard worker. James also confirmed that he considered Pybus to be a permanent employee. Regarding Pybus's post-injury pain level, James testified that he sees Pybus every day, and "[s]he never complains. Period."

¶41. As to Pybus's pre-injury and post-injury wages, James explained that the wages, terms, and conditions of the employment for hourly Kroger employees such as grocery clerks are covered by a collective bargaining agreement within the union. The record reflects that in October 2018, Pybus received a union pay raise.

¶42. Based on the testimony and evidence, the Commission affirmed the AJ's determination that Pybus sustained a permanent loss of wage-earning capacity. In so doing, the Commission referenced its prior order stating that Pybus successfully rebutted the

17

presumption of no loss of wage-earning capacity because she had presented evidence showing that her post-injury earnings were an unreliable indicator of her wage-earning capacity. Specifically, in its prior order, the Commission found that Pybus's age, her continued complaints of pain, Kroger's accommodations of her work duties, and Pybus's permanent restrictions showed that her post-injury earnings were an unreliable indicator of her wage-earning capacity.

¶43. The Commission explained that due to its prior determination that Pybus successfully rebutted the presumption of no loss of wage-earning capacity, the analysis in its August 17, 2020 final order "focuses on [Pybus's] pre-injury wages and post-injury capacity to earn wages on the open labor market." The Commission specifically referenced the testimony and vocational reports of Smith and Malone and found that "[Pybus] presented evidence of her post-injury wages on the open labor market" through Smith's testimony. The Commission acknowledged that Pybus's stipulated pre-injury average weekly wage was $562.40 and that according to Smith, Pybus's post-injury wage-earning capacity on the open labor market amounted to an average weekly wage of $349.20. Although Malone did not opine concerning Pybus's post-injury wage-earning capacity on the open labor market, the Commission found that Malone's testimony indicated that Pybus "has suffered a loss of access to the job market because of her work-related injury."

¶44. In *Pruitt*, 232 So. 3d at 827 (¶17), this Court affirmed the Commission's finding that the claimant, Pruitt, failed to rebut the presumption that he did not suffer any loss of wage-

18

earning capacity after Pruitt returned to his same employment, and his post-injury wages exceeded his pre-injury wages. Pruitt injured his back while performing his employment duties at Howard Industries. *Id*. at 824 (¶2). Pruitt's injury did not require surgery, and he eventually returned to work "in the same position with accommodations." *Id*. at 824 (¶3). After Pruitt returned to work, his primary post-injury duty at Howard Industries was operating a forklift, which he did not do prior to his injury. *Id*. at 824 n.1. Pruitt filed a workers' compensation claim, and the Commission ultimately found that Pruitt failed to prove that he suffered any permanent disability or loss of wage-earning capacity. *Id*. at 824 (¶6). On appeal, Pruitt argued that he had presented sufficient evidence to rebut the presumption that he suffered no loss of wage-earning capacity, including: his doctors gave him a post-injury impairment rating and light-work restrictions; his work restrictions prevented him from working the same job as he did pre-injury; his restrictions prevented him from earning overtime pay; he suffered a loss of access to jobs outside of his current employment; and his primary post-injury duty was one that he had not done before his injury. *Id*. at 826 (¶¶13, 15). Upon review, this Court determined that Pruitt's arguments failed to sufficiently overcome the rebuttable presumption of no loss of wage-earning capacity. *Id*. at 827 (¶17). This Court explained that Pruitt testified that he "returned to work at the same plant, in the same division, and in the same job but making a higher wage" and that although Pruitt returned to work with restrictions, the evidence established that his post-injury job was a necessary production job at Howard Industries. *Id*. at 827 (¶15). This Court further found

that Pruitt had continued his employment with Howard Industries, was in no danger of termination, and had not sought work outside of Howard Industries. *Id*. at (¶16).

¶45.    Similarly, in *McKenzie v. Howard Indus. Inc*., No. 2018-WC-01756-COA, 2020 WL 634072, at *7 (¶31) (Miss. Ct. App. Feb. 11, 2020), *cert. denied*, 302 So. 3d 643 (Miss. 2020), this Court affirmed the Commission's determination that the claimant, McKenzie, failed to rebut the presumption of no loss of wage-earning capacity. McKenzie appealed the Commission's decision, arguing that although she returned to work after her injury in the same position with a higher wage, she rebutted the presumption of no loss of wage-earning capacity by presenting the following evidence: McKenzie's increase in wages were the result of a union-negotiated pay raise; her restrictions prevented her from performing her same pre-injury jobs; and her restrictions also created a loss of access to jobs outside of her current employment. *Id*. at *6 (¶27). Recognizing that a "determination of loss of wage-earning capacity must be made by evaluating the evidence as a whole, including any other available clues," this Court determined that "the evidence as a whole was insufficient to support a finding that McKenzie had sustained a loss of wage-earning capacity." *Id*. at (¶¶27-28). This Court explained that the evidence showed that McKenzie successfully returned to work "earning the same or slightly higher wages than before her injury, and at the time of the hearing, she had remained in the same position with [her employer] for five years earning even higher wages." *Id*. This Court also found that McKenzie "was able to increase her own wage-earning capacity by working overtime hours and earning additional compensation."

20

*Id*. at (¶29). The evidence further showed that McKenzie's post-injury position was "a necessary production job[.]" *Id*. at (¶28). This Court found no evidence to indicate that McKenzie would be terminated by her employer or that she sought employment elsewhere and had been unsuccessful based upon her restrictions. *Id*. Although McKenzie presented expert testimony that she had suffered a loss of access to outside employment, this Court recognized that loss of access was only one of the factors to consider when determining loss of wage-earning capacity. *Id*.

¶46.     Conversely, in *Chambers v. Howard Indus. Inc*., 310 So. 3d 833, 835 (¶9) (Miss. Ct. App. 2021), this Court affirmed the Commission's finding that the claimant, Chambers, successfully rebutted the presumption of no loss of wage-earning capacity. Chambers returned to work post-injury making higher wages than he did pre-injury, and therefore the presumption of no loss of wage-earning capacity arose. *Id*. at 835 (¶8). However, the Commission found that Chambers successfully rebutted this presumption by presenting the following evidence: Chambers does not perform his job in the same manner as he did pre-injury due to accommodations provided by his employer; Chambers's increase in his post-injury wage resulted from an overall increase in general wage levels; and that as a result of his injury, Chambers would suffer a decrease in wages in the open labor market. *Id*. at (¶9). On appeal, this Court agreed that the evidence presented by Chambers was sufficient to rebut the presumption of no loss of wage-earning capacity. *Id*.

¶47.     Before applying the relevant law to the claim and evidence before us, we reiterate that

21

if the Commission's decision is supported by substantial evidence, we may not overturn the decision "even if, were this Court acting as fact-finder, we would have reached the opposite conclusion." *Neshoba Cnty. Gen. Hosp.*, 999 So. 2d at 1298 (¶8). "[D]ecisions as to loss of wage-earning capacity are largely factual and are to be left largely to the discretion and estimate of the commission." *Id.* (internal quotation marks omitted). Furthermore, "[b]ecause the Commission is the ultimate fact-finder and judge of the credibility of the witnesses, this Court may not reweigh the evidence before the Commission." *Gregg*, 64 So. 3d at 475 (¶8). Keeping this standard in mind, we find that the record contained sufficient evidence to support the Commission's finding that Pybus sustained a permanent loss of wage-earning capacity and was entitled to permanent partial disability benefits. *See Seals*, 301 So. 3d at 587-88 (¶5) ("For a decision to be supported by substantial evidence, the underlying evidence must provide a substantial basis of fact from which the fact in issue can be reasonably inferred." (internal quotation marks omitted)). We agree with Kroger's assertion that the Commission must review the evidence as a whole when making a determination as to loss of wage-earning capacity and that loss of access is only one of the factors to consider in making this determination. Although the Commission's final order focuses on the factor of loss of access, the Commission explained that this focus is because the Commission has already determined that Pybus successfully rebutted the presumption of no loss of wage-earning capacity in its prior order.

¶48. As stated, in its prior order, the Commission found that Pybus presented sufficient

22

evidence to rebut the presumption of no loss of wage-earning capacity; specifically, that she returned to her employment at Kroger in an accommodated manner, as well as evidence of Pybus's age, work restrictions, and her continued complaints of pain.[6] The evidence shows that although James Smith testified that Kroger was not providing Pybus with post-injury work accommodations and that Pybus returned to the same job and duties that she performed pre-injury, both Pybus and Kathy Smith provided testimony that Pybus was allowed to self-accommodate Pybus's position and work at her own pace. Malone also described Pybus's post-injury position and duties as "modified." Pybus's November 2018 FCE results restricted Pybus to light duty work with occasional medium level work. Pybus, Smith, and Malone testified that the duties of a grocery clerk exceed the restrictions placed on Pybus as a result of her FCE. Smith also testified that at Pybus's age, the chances of Pybus getting another job within her FCE restrictions are slim. Regarding her pain, Pybus testified that she experiences pain every day and that the pain is worse when she works a full day. Dr. Russell stated that Pybus is "going to be a little bit achy, especially with a lot of activity." Dr. Russell opined that Pybus's complaints of achiness were consistent with her injury.

¶49. We find that this evidence, in addition to Pybus's evidence that she suffered a loss of access on the open labor market due to her work-related injury, was sufficient to support the

_____

[6] *See Sheffield v. S.J. Louis Constr. Inc.*, No. 2018-WC-00385-COA, 2019 WL 1349766, at *8 (¶42) (Miss. Ct. App. 2019) (Wilson, P.J., dissenting) ("There is no requirement that the Commission specifically list all of the evidence that it has considered, or specifically say which evidence it considers credible or not credible."), *rev'd*, 285 So. 3d 614 (Miss. 2019).

Commission's finding that Pybus successfully rebutted the presumption of no loss of wage-earning capacity. We therefore affirm the Commission's decision.

¶50.   **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**