**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2003-CT-01343-SCT**

*BARBER SEAFOOD, INC. d/b/a UNCLE
CHESTER'S FISH HOUSE AND MISSISSIPPI
RESTAURANT ASSOCIATION WORKMEN'S
COMPENSATION TRUST*

**v.**

*SANDRA LOUISE SMITH*

**ON WRIT OF CERTIORARI**

DATE OF JUDGMENT:                           03/12/2003
TRIAL JUDGE:                                HON. R. I. PRICHARD, III
COURT FROM WHICH APPEALED:                  PEARL RIVER COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:                   JOHN S. GONZALEZ
                                            SHANE CURTIS WHITFIELD
ATTORNEY FOR APPELLEE:                      WILLIAM H. JONES
NATURE OF THE CASE:                         CIVIL - WORKERS' COMPENSATION
DISPOSITION:                                AFFIRMED IN PART AND REVERSED IN
                                            PART - 08/04/2005
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This is the culmination of several appeals of a workers' compensation case. The
Administrative Judge's ruling was appealed to the Workers' Compensation Commission which
affirmed in part and reversed in part. The Commission's decision was appealed to the Pearl
River County Circuit Court, which reversed a portion of the Commission's decision. The
circuit court's decision was appealed to this Court, and the matter was referred to the Court
of Appeals, which affirmed the circuit court's judgment. *See **Barber Seafood, Inc. v. Smith**,*

2004 WL 1728601 (Miss. Ct. App. 2004). All parties petitioned this Court for additional review, and we granted certiorari.

## BACKGROUND FACTS AND PROCEEDINGS

¶2. Sandra Louise Smith worked as head cook at Barber Seafood, Inc., d/b/a Uncle Chester's Fish House. In December, 1998, she slipped on water and grease on the kitchen floor and attempted to break the fall using her right hand and arm. After an emergency room visit the following day, Smith was treated by several doctors for pain in her wrist and back.

¶3. Smith saw her family physician, Dr. T. O. McRaney, approximately ten times. She was referred her to Dr. Christopher Fox, an orthopedic surgeon. A CT study which was performed on February 23, 1999, indicated no evidence of disc bulging or herniation at L4-5 or L5-S1. However, an MRI performed on May 13, 1999, revealed mild central disc protrusion at L5-S1, but was otherwise normal. Over the next two years, Smith saw several physicians for diagnosis and treatment.

*Dr. Lew*

¶4. In June, 1999, Smith began to see pain management specialist Dr. Christopher Lew, who gave Smith myoneural lumbo-sacral or lumbar epidural injections until August 1999, when he stated that "if [Smith] is not interested in further injections, then I have little else to offer her." The injections resumed on August 20, 2001.

*Dr. Krieger*

¶5. Smith originally saw Dr. Charles Krieger for treatment of her wrist injury. After performing carpal tunnel decompression surgery to her right wrist on June 15, 1999, Dr. Krieger opined that Smith reached maximum medical improvement (MMI) for the wrist injury on September 17, 1999.

¶6. Dr. Krieger also saw Smith on a follow-up visit on January 19, 2000, for complaints of back pain. In deposition testimony, Dr. Krieger stated his "impression was that she could be a candidate for a diskectomy and fusion because she had two discs that were not normal." However, when asked whether he thought Smith "should reasonably submit to a surgery," Dr. Krieger testified, "Well, I can't really answer that question. You know, I only saw her one time, and I'll stand behind what I said, which basically is that she could be a candidate for it if that's her choosing."

¶7. When asked a follow-up question of whether he would recommend the surgery, he testified, "Well, I wouldn't recommend it unless she was just in such severe pain that there was no other way to control it, and she had ruptured discs."

*Dr. Provenza*

¶8. Dr. Louis Provenza, a neurosurgeon, originally saw Smith on August 5, 1999, noting that she suffered from "L5-S1 disk injury consistent with the history of suffering a fall." On September 17, 1999, Dr. Provenza recommended muscle strengthening and a functional capacity examination (FCE), which was performed on November 11, 1999. According to the facts provided by the Court of Appeals:

> On November 12, 1999, Smith was transported by ambulance to the office of Dr. Provenza. She was admitted to the hospital where MRI testing revealed

3

"multi-level stenosis most notable at L4-5 and slightly to a lesser extent at L5-S1, the stenosis present as a result of a large right posterior lateral disc herniation." This was said to be a deterioration of her condition. On December 23, 1999, Dr. Provenza recommended lumbar fusion at L5-S1 and L4-5 in order to treat two ruptured disks. He noted that the L4-5 was worse, and the L5-S1 was still there.

*Barber Seafood, Inc. v. Smith*, 2004 WL 1728601 at ¶¶ 2-9. When asked if he made any recommendations to Smith, Dr. Provenza testified, "I subsequently saw her and recommended lumbar surgery with a fusion." When asked, "So there is additional medical care you could provide [Smith] by way of surgical intervention that may improve her condition," Dr. Provenza replied, "Correct."

*Dr. Gutnisky*

¶9.     Dr. Gustavo Gutnisky, a neurosurgeon who examined Smith at the request of the employer and carrier, was asked if he could state to a reasonable degree of medical certainty "whether [Smith] would benefit from surgical intervention?" His response was,

> Basically I told her that if she didn't want surgery, she didn't have to. There was no – this is not a matter of life and death. And she was, in my opinion, not a major risk of getting paralyzed or developing any, you know, significant neurological deficit. The only reason to do the surgery would be to get rid of the pain. In my opinion, and, you know, quite a bit of people too, lumbar fusions are fairly unpredictable as far as whether they're going to be successful in getting rid of the back pain. . . . We had an understanding that it would be very difficult to predict whether the surgery would give her any relief.

¶10.    Smith filed a petition to controvert, claiming additional temporary and total disability benefits.

*The Administrative Judge's Decision*

¶11.  Smith's case was first heard by Administrative  Judge Cindy P. Wilson ("AJ") on September 5, 2001.  During the course of the hearing, the AJ was presented with the testimony by deposition of numerous doctors and other witnesses.  The AJ also heard the live testimony of Smith and several witnesses including a private investigator who presented video surveillance tapes of Smith's activities.

*Prior work-related injuries*

¶12.  The AJ found that Smith was not entirely forthcoming in her testimony concerning prior work-related injuries.  The AJ noted that, during cross-examination, Smith admitted she fell and injured her head, shoulders, neck and back during her prior employment at Delchamps, resulting in visits to her doctor and "in excess of 10 chiropractic visits."  The AJ found that Smith "suffered another work-related accident prior to her employment with Barber, while working for Claiborne Hill Deli, where she cut her knuckles on a meat slicer."  The AJ further observed that, contrary to Smith's testimony of no other work-related accidents prior to the accident at Barber Seafood, there "was a March 5, 1998, Crosby Memorial Hospital emergency room record . . . which reflects that Ms. Smith presented to the emergency room via ambulance complaining that while at work (The Warehouse), some boxes and groceries fell on her and hit on her left neck and shoulder."

*Other injuries*

¶13.  The AJ pointed out that, in her direct testimony, Smith admitted fracturing her ankle while watching her daughter at a school function, but denied any other injuries subsequent to the accident at Barber Seafood.  However, according the AJ, Smith "back peddled" on cross-

5

examination, admitting that she "failed to mention" a head-on collision which resulted in a total loss to her vehicle. The AJ also stated, "Initially, she stated that she was not hurt during that accident; however, she then testified that 'It shook me up enough that I had to go to the Emergency Room for spasms in my back.'" The AJ further stated that "[Smith] was also involved in two automobile accidents, one occurring during her 20's, resulting in a concussion and the other accident occurring when someone backed into her automobile."

¶14. Upon conclusion of the hearing, the AJ issued her opinion on May 17, 2002, which included the following findings:

*The wrist injury*

¶15. The AJ held that Smith "sustained work related injuries[1] on December 31, 1998, to her right wrist. . . ." The AJ further stated, "Dr. Krieger assigned no impairment rating nor did he assess any restrictions and was of the opinion that [Smith] could return to her prior employment as a cook." Finally, with respect to the wrist injury, the AJ stated that Smith reached maximum medical improvement of her wrist injury on September 17, 1999.

*Injury to the disc at L4-5*

¶16. The AJ found that Smith "failed to meet her burden of proof that the condition of the L4-5 [was] causally related to the December 1998 accident." The AJ based this finding on

> several factors including the fact that the May 1999 lumbar MRI did not reflect a rupture or bone spur, yet the November 1999 lumbar did. As stated by Dr. Krieger, "the fact that she had an MRI that showed a bulge at L-5 and then six months later she had a disc that looks like it's almost ruptured, something

---

[1]The AJ recited Dr. Krieger's opinion "that the carpal tunnel was not traumatic in origin, but . . . the trauma may have aggravated it."

6

happened, you know, to make that worse." Further, when Dr. Provenza was questioned as to whether he could causally relate to a reasonable degree of medical certainty the L4-5 levels as to the December 1998 injury, he stated, "Now, whether the L4-5 or L4-5 level is a progression of her initial injury or a different injury, I can't tell." Additionally, Dr. Gutnisky, who apparently was the only one of these three physicians who actually reviewed the films from the November 1999 lumbar MRI, testified that at the L4-5 level the Claimant had degenerative disc disease and a central and a slightly off to the right rupture of the disc *or* bony spur. Dr. Gutnisky attributed the change in the MRIs, in the absence of any additional trauma, to part of the aging process.

¶17. Thus, the AJ denied Smith's claim[2] with respect to her claim of injury to the disc between the fourth and fifth lumbar vertebra.

*Injury to the disc at L5-S1*

¶18. The AJ held that the injury at L5-S1 was related to the accident at Barber Seafood, and that Smith reached maximum medical improvement on June 28, 2000. Because the AJ's findings with respect to the injury at L5-S1 are not clearly reflected in the opinions issued as a result of the various appeals, we shall set forth verbatim the AJ's findings[3] in that regard:

> In regard to the injury to the L5-S1, it is the opinion of the undersigned that **Claimant reached maximum medical improvement on June 28, 2000, which is the last date Dr. Lew treated the Claimant until approximately one year later, May 14, 2001, when Claimant again saw Dr. Lew. As to the L5-S1, any subsequent visits to Dr. Lew were related to maintenance of medications, for referrals to Drs. Boutte and/or Madow for psychological treatment which is not an issue, or for conditions which are not casually related to the December 1998 accident**.

---

[2]As discussed infra, we do not find where Smith made any specific claim for injury at L4-5. She refused surgery, and the parties have stipulated that a work-related injury occurred. Thus, the issue at this point is irrelevant.

[3]Emphasis in bold is added. Emphasis in italics was in the original. It is noteworthy that the circuit court would later adopt the findings of fact by the AJ and the Commission.

In regard to the issue of surgical intervention for the L5-S1 condition, of the three specialists who examined the Claimant, Dr. Provenza (neurosurgeon), is of the opinion that Claimant should undergo back surgery, while the **orthopaedic surgeon, Dr. Krieger and another neurosurgeon, Dr. Gutnisky are of the opinion that surgery is not warranted as the results are unpredictable**. Dr. Krieger has opined that as the Claimant has two bulging discs that are obviously not ruptured, to undergo **excision of those disc and back fusion carries with it a lot of risk**. Although Dr. Provenza is of the opinion that the **lumbar surgery might improve Claimant's condition, it is the opinion of the undersigned that the testimony of the other two physicians, primarily Dr. Gutnisky, is more compelling**. Dr. Gutnisky was the last of these three specialists to examine the Claimant, approximately one year subsequent to **Dr. Provenza's last examination of Claimant, and he is unequivocal in his opinion that the outcome of such a surgical procedure is speculative**.

This point distinguishes the subject case from <u>Dorris v. Mississippi Regional Housing Authority</u>, 695 So. 2d 567 (Miss. 1997) and <u>Triangle Distributors v. Russell</u>, 268 So. 2d 911 (Miss. 1972). As set forth in Dunn, <u>Mississippi Workmen's Compensation,</u> 3d ed., Section 75(1982)(citing <u>Triangle Distributors</u>, 268 So. 2d 911):

A special situation arises when an employee refuses recommended surgery which, if performed, *would likely reduce or eliminate disability,* as in the usual case of a ruptured intervertebral disc. In such cases, the disability, pending corrective surgery, is to be classified as temporary in quality. (Emphasis added).

**It is the opinion of the undersigned that in this case, two physicians are not of the opinion that surgical intervention would likely reduce or eliminate disability**, one being the last of the three physicians to examine the Claimant. Additionally, there is no proof that Dr. Provenza's opinion would have remained the same and it is the opinion of the undersigned that Dr. Gutnisky's opinion is more persuasive as he was the last of the three surgeons to examine the Claimant and such examination was conducted more than one year following Dr. Provenza's last visit with the Claimant. Furthermore, Dr. Gutnisky had the November 1999 films and not just the report regarding this MRI and he provided his opinion regarding maximum medical improvement and that same had been achieved in this case. Based on the above, it is the opinion that this case is distinguishable from those cited above and maximum medical improvement as to the Claimant's L5-S1 condition was attained as of June 28, 2000.

¶19. The AJ further held that, because Smith "did not begin looking for employment until a month prior to the hearing," she suffered "no loss of wage earning capacity and as such [was] not entitled to any permanent disability benefits."

*The Commission's decision*

¶20. Smith appealed the AJ's decision to the Commission, which held:

> Based on the entire record, we agree with the Administrative Judge's decisions regarding the admission of evidence, and the conclusion that Smith failed to prove any causal relationship between her December 31, 1998 accidental injury, and her back condition at level L4-5. We also agree with the Judge's finding that Smith reached maximum medical improvement from her carpal tunnel syndrome injury on September 17, 1999 and has suffered no permanent impairment, functional or occupational, as a result of this injury. Finally, we agree with the Judge's finding that **Smith reached maximum medical improvement from her back injury at level L5-S1 on June 28, 2000 and that surgical intervention has not been shown to be medically reasonable and necessary**. (Emphasis added)

¶21. In reversing the AJ's finding that Smith suffered no loss of wage earning capacity, the Commission found that, even though Smith's "efforts to find other suitable employment . . . [were] subject to question," she suffered a 25% loss of wage earning capacity. The factual basis for this finding was that Smith's physical restrictions from the injury limited her employment opportunities "to light duty, minimum wage labor which will likely allow her to work a more traditional 40 hour week." Prior to her injury, Smith was working approximately 60-80 hours per week, averaging about $5.00 an hour. The Commission found the reduction in hours reduced Smith's income by roughly 25%. The employer and carrier were ordered to pay Smith $50.00 per week for 450 weeks.

*The Circuit Court's decision*

9

¶22.   Smith appealed and Barber Seafood cross-appealed to the Pearl River County Circuit Court, which affirmed the Commission in all respects except its alleged "finding that Smith reached MMI for her L5-S1 back injury on the date she refused surgery."[4]   The circuit court held that the Commission was "REVERSED AND REMANDED as to their finding that Smith reached MMI for her L5-S1 back injury on the date she refused surgery."

*The Court of Appeals' decision*

¶23.   Barber Seafood appealed and Smith cross-appealed to this Court, and the matter was referred to Court of Appeals, which affirmed the circuit court's decision.   That is, the Court of Appeals determined that Smith's "refusal to undergo recommended surgery that would improve her condition prevents the claimant from being found to have reached maximum medical improvement." ***Barber Seafood, Inc. v. Smith***, 2004 WL 1728601 (¶ 19) (Miss. Ct. App. 2004).

¶24.   Following the decision rendered by the Court of Appeals, all parties petitioned this Court for a writ of certiorari.   We granted the petitions.

**ANALYSIS**

¶25.   Although other issues were raised in the appeal and petitions for writ of certiorari, the issue we find to be dispositive of this case is whether, as to the injury to the disc between her fifth lumbar and first sacral vertebra, Smith reached MMI on June 28, 2000, as determined by

---

[4]A careful review of the record reveals that neither the Commission nor the AJ made a finding that Smith reached MMI "on the date she refused surgery."  Rather, the Commission (and the AJ) found Smith reached MMI "on the last date Dr. Lew treated [Smith]," based on a finding that surgery would not likely reduce or eliminate disability.  See ***Triangle Distributors v. Russell***, 268 So. 2d 911, 912 (Miss. 1972) (surgery "would most probably affect a substantial improvement in claimant's condition.").

the AJ and affirmed by the full Commission. If not, then Smith is entitled to continue to receive temporary benefits until such time as she reaches MMI. It is well established that a claimant cannot receive permanent disability benefits until he or she has reached MMI. *Houston Contracting Co. v. Reed,* 231 Miss. 213, 221, 95 So.2d 231, 234 (1957).

*The refusal of surgery*

¶26. This case appears to have gotten off track when the circuit court entertained as one of the issues before it, "Whether the Commission plainly erred in concluding Smith reached MMI on the date she declined surgery." This statement of issue presupposes that the Commission (and the AJ) based the finding of MMI on Smith's refusal of surgery. The record does not support any such presupposition. In the "DECISION" portion of her opinion, the AJ stated, "It is the opinion of the undersigned that in this case, two physicians are not of the opinion that surgical intervention would likely reduce or eliminate disability, one being the last of the three physicians to examine the Claimant." The AJ further stated that, because she concluded that surgical intervention would not likely reduce or eliminate disability, the holdings in *Dorris* and *Triangle Distributors* were distinguishable, rendering Smith's refusal of surgery irrelevant. Thus, the issue before the circuit court should have been whether the Commission abused its discretion in finding that "surgical intervention has not been shown to be medically reasonable and necessary."

*Standard of review*

¶27. The circuit court accurately recited in its opinion the standard for review of a decision of the Commission:

11

It is well settled in this state that the Mississippi Worker's Compensation Commission is the ultimate fact-finder in cases of this kind. *Smith v. Jackson Constr. Co*., 607 So. 2d 1119, 1123-24 (Miss. 1992). The Commission is also the ultimate judge of the credibility of witnesses. *Miller Transporters, Inc. v. Guthrie*, 554 So. 2d 917, 918 (Miss. 1989). Consequently, this Court must defer to decisions by the Commission on issues of fact and credibility unless the Commission commits prejudicial error. *Smith*, 607 So. 2d at 1124. Further, neither this Court nor the Mississippi Supreme Court is empowered to determine where the preponderance of the evidence lies when the evidence is conflicting.. *Id*. Instead, this Court must affirm the decision of the Commission where substantial credible evidence supports the Commission's order. *Id*.

This Court is

bound by the decision of the Mississippi Workers' Compensation Commission if the Commission's findings of fact are supported by substantial evidence...Stated differently, this Court will reverse the Commission's order only if it finds that order clearly erroneous and contrary to the overwhelming weight of the evidence. A finding is clearly erroneous when, although there is some slight evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made by the Commission in its findings of fact and in its application of the Act.

*Hardaway Co. v. Bradley,* 887 So.2d 793, 795 (Miss. 2004) (citations omitted).

¶28. In explaining its reversal of the Commission, the circuit court cited *Dorris v. Mississippi Regional Housing Authority*, 695 So. 2d 567 (Miss. 1997), for the proposition that a worker's reasonable refusal of corrective surgery will not trigger MMI, and the injury must be classified as "total in character and temporary in quality." *Id*. at 568. The circuit court then stated:

The Court is mindful of Justice Smith's articulate dissent in *Dorris* where he expressed his concerns about that the creation of a class of claimants entitled to receive, "temporary benefits on a seemingly 'permanent basis,'" *Id*. at 569, but this Court is not the proper forum for overturning a rule of law reaffirmed just six years ago.

12

¶29. Whether this Court will revisit its holding in *Dorris* is a question for another day. The case before us requires us only to determine whether the Commission abused its discretion in its evaluation of the testimony of the doctors concerning Smith's need for surgery. Based upon the record[5] and the testimony of the doctors discussed and recited supra, we are unable to say any such abuse of discretion occurred.

*The L4-5 injury*

¶30. The AJ found that "[i]n regard to the back injury at L4-5, it is the opinion of the undersigned that the Claimant has failed to meet her burden of proof that same is causally related to the December 31, 1998 accident." We are troubled by this finding because Smith never placed the question before the AJ. The parties stipulated that Smith sustained a work-related injury. Therefore, absent a demand by Smith for medical treatment or compensation for her injury at L4-5, the issue of whether the L4-5 injury (as opposed to the injury at L5-S1) is causally related her accident at work was not before the AJ. Furthermore, because of her refusal of surgery, Smith was not on fair notice that the AJ was going to differentiate problems at the L4-5 level from problems associated with L5-S1. It is not too surprising that Smith "failed to meet her burden of proof" because she very well may have been unaware she had one as to this issue. Counsel for both Smith and the employer/carrier engaged in cursory, minimal questioning of the physicians on this point, leading us to conclude that counsel were probably somewhat surprised at the finding.

---

[5]We find it important to note that all of the doctors related Smith's need for surgery to her subjective experience of, and tolerance for, pain. The credibility of Smith's testimony in that regard was obviously important and was for the Commission and AJ to evaluate.

¶31. We hold that the issue of whether the L4-5 injury is related to Smith's work-related accident will ripen for adjudication only if and when Smith decides to undergo back surgery. If such a time occurs, Smith must present her claim for the payment of medical treatment and expenses pursuant to the applicable law and rules.

## CONCLUSION

¶32. We reverse the Court of Appeals and the Circuit Court of Pearl River County as to their determination that Smith did not reach maximum medical improvement on June 28, 2000, with respect to her injury at L5-S1. We hold that the Commission did not abuse its discretion in its finding that surgical intervention was not shown to be medically reasonable or necessary, and that Smith reached maximum medical improvement on June 28, 2000.

¶33. We further hold that the Court of Appeals, the Circuit Court of Pearl River County, and the Commission were all premature in holding that Smith's condition at L4-5 was unrelated to her work-related injury. Until such time as Smith seeks medical treatment for that condition, the matter is not ripe for decision.

¶34. We affirm the Court of Appeals, the Circuit Court of Pearl River County, and the Commission as to their determination that Smith suffered a 25% loss in wage earning capacity.

¶35. **AFFIRMED IN PART AND REVERSED IN PART**.

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**