# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-WC-01232-COA

**WALTER CAFFEY**                                                          **APPELLANT**

**v.**

**FORREST HEALTH D/B/A FORREST**                                    **APPELLEE**
**GENERAL HOSPITAL**

DATE OF JUDGMENT:            10/24/2023
TRIBUNAL FROM WHICH          MISSISSIPPI WORKERS'
APPEALED:                    COMPENSATION COMMISSION
ATTORNEY FOR APPELLANT:      TAYLOR R. BRINKLEY
ATTORNEY FOR APPELLEE:       JOSEPH O'CONNELL
NATURE OF THE CASE:          CIVIL - WORKERS' COMPENSATION
DISPOSITION:                 AFFIRMED - 03/18/2025
MOTION FOR REHEARING FILED:

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1.     Walter Caffey sustained a compensable injury to his low back while working as a security guard at Forrest County General Hospital (FGH) in Hattiesburg, Mississippi. He now appeals the decision of the Mississippi Workers' Compensation Commission (the Commission). The full Commission affirmed the administrative judge's (AJ) order awarding Caffey temporary total disability benefits, but in a two-to-one split, the majority reversed the AJ's order awarding permanent partial disability benefits. On appeal, Caffey argues the Commission erred in reversing the AJ's award of permanent benefits.[1] He claims the AJ was correct in finding he sustained a fifty-percent loss of wage-earning capacity from

---

[1]     Caffey's award of temporary total disability benefits is not at issue in this appeal.

his work injury. Finding no reversible error, we affirm the Commission's ruling.

## PROCEDURAL HISTORY

¶2. On October 8, 2019, Caffey injured his low back at FGH when he twisted while helping an elderly patient from his vehicle to a wheelchair. Before Caffey initiated workers' compensation proceedings, on March 16, 2021, Caffey underwent a lumbar (L4-5) spinal fusion performed by Dr. Richard Clatterbuck, a Hattiesburg neurosurgeon. On June 1, 2021, Caffey filed a petition to controvert. On March 21, 2022, Dr. Clatterbuck ordered a functional capacity evaluation (FCE). Caffey underwent the FCE in April 2022, and on May 4, 2022, Dr. Clatterbuck agreed with the impairment rating of thirteen percent to the body as a whole. Both the AJ and the Commission found Caffey's official maximum medical improvement (MMI) date to be May 4, 2022.

¶3. On October 7, 2022, the AJ conducted a hearing on the merits and issued an order on December 15, 2022. The AJ found Caffey had sustained a compensable injury to his low back on October 8, 2019, which resulted in his lumbar fusion surgery. Caffey was placed on permanent sedentary and possibly light-duty work restrictions. Caffey was assigned a thirteen-percent whole-body impairment rating. The primary issue the AJ addressed was whether Caffey had demonstrated a loss of wage-earning capacity due to his injury, i.e., entitlement to permanent disability benefits. Whether a claimant's permanent disability is partial or total is a question of fact to be determined from the evidence as a whole, including medical and lay testimony. *McGowan v. Orleans Furniture Inc.*, 586 So. 2d 163, 167 (Miss.

2

1991).

¶4.    The AJ applied the *Jordan/Thompson* test—which consists of two methods our supreme court has recognized to determine whether a claimant has established a prima facie case for total disability,[2] as set forth in *Jordan v. Hercules Inc.*, 600 So. 2d 179 (Miss. 1992), and *Thompson v. Wells-Lamont Corp.*, 362 So. 2d 638 (Miss. 1978).  The *Jordan* method provides that the claimant makes a prima facie case for total disability when, after reaching MMI, the claimant reports back to work and the employer refuses to reinstate or hire the claimant. *Jordan*, 600 So. 2d at 183.  Alternatively, the *Thompson* method requires showing proof of a reasonable job search to establish a prima facie case for total disability. *Thompson*, 362 So. 2d at 640-41.  Under either test, if the prima facie case is made, "[t]he burden then shifts to the employer to prove a partial disability or that the employee has suffered no loss of wage earning capacity" (*Jordan*) or "to rebut or refute [the] claimant's evidence" and show "the claimant's efforts to obtain other employment were a mere sham, or less than reasonable, or without proper diligence" (*Thompson*).  *Jordan*, 600 So. 2d at 183; *Thompson*, 362 So. 2d at 640-41.

¶5.    The AJ found that Caffey presented a prima facie case for total disability because of FGH's inability to return Caffey to his former or a similar job, creating a presumption of

---

[2]    "The disability contemplated . . . is an occupational disability, not a medical disability." *Marshall Durbin Inc. v. Hall*, 490 So. 2d 877, 880 (Miss. 1986).  A claimant can suffer a functional or medical disability with no impact on the claimant's ability to perform his job and earn wages. *Robinson v. Packard Elec. Div., Gen. Motors Corp.*, 523 So. 2d 329, 331 (Miss. 1988).

total disability under *Jordan*. The AJ then found that the "presumption was overcome by [FGH's] vocational proof showing that [Caffey] is employable at multiple jobs in the sedentary work level. The AJ did not analyze the issue under *Thompson* but noted that "[t]he presumption was not aided by [Caffey's] single day job search efforts." The AJ found the medical proof showed Caffey had "been medically restricted as a result of his work injury" that "prevented him from returning to his usual employment with the hospital." Further, the vocational proof showed Caffey's limitation to light and sedentary work would result in a loss of wage-earning capacity of fifty percent due to his back injury. The AJ concluded that Caffey was entitled to temporary total disability benefits of $494.48 per week[3] from March 16, 2021 (the date of his lumbar fusion surgery) through May 4, 2022 (the date of his MMI) based on an average weekly wage of $827.30. The AJ also found that Caffey was entitled to permanent partial disability benefits of $275.78 per week from May 5, 2022, for 450 weeks based on an average weekly wage of $827.30 due to his fifty-percent loss in wage-earning capacity. FGH appealed the AJ's ruling to the full Commission.

¶6.    On October 24, 2023, the full Commission affirmed the AJ's ruling that awarded Caffey temporary total disability benefits; however, in a two-to-one split, the Commission reversed the award of permanent partial disability benefits. The majority determined that Caffey did not establish a prima facie case for total disability under either the *Jordan* or

---

[3]  The Commission noted that this amount is the maximum allowed for injuries occurring in 2019.

4

*Thompson* methods. The Commission found it was "clear that Caffey could not return to his previous job as a public safety officer"; however, after reaching MMI, Caffey never reported back to FGH to seek work. Further, the Commission found that "even if" Caffey had reported back to work, FGH did not refuse to hire him because it "*tendered* two jobs about which Caffey failed to inquire." (Emphasis added). Thus, the Commission concluded that under the *Jordan* method, there was no prima facie case. The Commission also found that Caffey's job search was unreasonable under the *Thompson* test, stating:

> We find the above described job search was not reasonable. In the five months between MMI and the date of the hearing, Caffey conducted a job search on only one day. During that five month period, Caffey's job was to find a job. He should have been looking for jobs on-line, networking through friends, making in person visits to employers, and taking any and all steps necessary to find a job. Unfortunately, there is only a scintilla of evidence in the record of Caffey making an effort to find work during that time.

The majority further explained:

> Caffey may not want another job because he is drawing retirement benefits through PERS, his wife suffered a stroke and he acts as her caregiver, and the medications he takes for various non-work related ailments deprive him of energy and make him feel tired all the time. Those are legitimate reasons for not working; however, none has anything to do with his October 8, 2019, on-the-job injury. To be entitled to permanent disability benefits, Caffey had to show a reason why he could not work or even look for work which is related to his on-the-job injury. He has failed to do so.

The Commission concluded that Caffey was not entitled to permanent disability benefits.

Caffey appealed this ruling.

## STATEMENT OF FACTS

### *Work Experience and Skills*

5

¶7. Caffey was sixty-one years old in March 2022, with a lengthy employment history. Caffey graduated from high school with no other formal education or vocational training. For eight to ten years, he worked in oil fields doing labor-intensive jobs. In the 1980s, while working on an oil rig, Caffey sustained a low back injury when he fell and landed on his back, which resulted in surgery.

¶8. In 1990, Caffey joined the Forrest County Sheriff's Department, holding a variety of positions over his twenty-five-year tenure. Initially, he worked as a jailer and then supervised a county work center. In 1993, Caffey attended a law enforcement training academy to become a deputy sheriff. From 1993 to 2001, Caffey worked as a patrol unit deputy, and he was eventually promoted to captain of the unit. Caffey also attended a drug training academy to become a narcotics unit deputy. From 2001 to 2009, Caffey worked in this capacity off and on, occasionally returning to the patrol unit. Eventually, he became commander of the narcotics unit.

¶9. In October 2008, while working full time at the sheriff's department, Caffey began working part time as a security guard at FGH on an as-needed basis. In 2015, he retired from the sheriff's department and began drawing his state retirement benefits. From 2015 until 2021, Caffey worked full time as a security guard at FGH.

¶10. Caffey agreed that his years as a patrol deputy developed his interpersonal and communication skills, which enabled him to deal confidently and effectively with individuals in a variety of situations. Further, as a deputy sheriff, Caffey wrote daily

6

incident reports on a computer that required him to construct a narrative about the incident. During the last ten to fifteen years as a deputy sheriff, Caffey's reports were prepared electronically on a computer. As a narcotics officer, his duties included preparing and executing search warrants, conducting surveillance, and interviewing informants. Due to Caffey's positions as captain of the patrol unit and commander of the narcotics unit, he developed supervisory and leadership skills as well.

¶11. As a full-time security guard at FGH, Caffey primarily worked in the emergency room from noon until midnight. Physically, the job required frequent walking, standing, sitting, reaching, and carrying. It also required occasional running, climbing, and lifting. His duties ranged from completing safety reports to restraining patients and responding to other incidents. After each incident, he had to write a report of what happened, which was prepared on a computer.

### *Medical Evidence*

#### *Pre-Existing Conditions*

¶12. In 1986, Caffey had surgery on his low back (L4-5) for a herniated disc from falling while working on an oil rig. In March 2017, two years before the work injury at issue here, Caffey hurt his back in a work-related injury at FGH when he had to jump out of a window onto a rooftop to restrain a psychiatric patient who was trying to escape. In April 2017, Caffey was treated for back pain and foot numbness by Dr. Daryl Johnson, a neurosurgeon at the Hattiesburg Clinic. Caffey was diagnosed with chronic back pain and sciatica. Dr.

Johnson referred Caffey to Dr. Brett Bevard, a physiatrist at the Hattiesburg Clinic, for conservative treatment. Caffey admitted to Dr. Bevard that the pain started after his work-related injury in March when he was chasing a patient. In June 2017, Dr. Bevard performed an epidural steroid injection on Caffey's back. Three weeks later, Caffey was doing well; so Dr. Bevard placed him at MMI, allowing him to return to full-duty work with no restrictions.

¶13. In September 2019, two years later and about two weeks before the injury at issue, Caffey returned to the Hattiesburg Clinic and saw a nurse practitioner for low back pain. Caffey was diagnosed with lumbar radiculitis and spinal stenosis. Epidural steroid injections in the lumbar area were recommended, but Caffey did not receive these injections before his injury on October 8, 2019.

*Work Injury of October 8, 2019*

¶14. On the day of this work injury, Caffey was first treated at the FGH emergency room for low back pain. Caffey stated that the pain started when he was assisting a patient from his vehicle to a wheelchair. Caffey was discharged and restricted from conducting heavy lifting, pushing, or pulling until following up with his primary care physician, who had diagnosed him with low back pain and sciatica. A week after the injury, Caffey returned to work under modified duty. At his request, Caffey was placed under the care of Dr. Bevard and his affiliated nurse practitioners.

¶15. Over the next year, Dr. Bevard treated Caffey's injury conservatively, with Caffey's

8

receiving several lumbar epidural steroid injections, which initially helped his pain. When his back pain increased, Dr. Bevard referred Caffey to Dr. Clatterbuck, a neurosurgeon at the Hattiesburg Clinic, who first saw Caffey in February 2020. Dr. Clatterbuck diagnosed Caffey with osteoarthritis of the spine, low back pain, and sciatica. His review of an MRI showed degenerative disc disease at L4-5, stenosis, and radiculopathy in the lumbar region; however, Dr. Clatterbuck did not recommend spinal surgery at that time. In March 2020, Dr. Bevard placed Caffey at MMI and released him to full-duty work without restrictions; however, Caffey would need spinal injections in the future. Dr. Bevard noted that Caffey was not interested in spinal surgery at that time.

¶16. In January 2021, a year after his initial evaluation, Dr. Clatterbuck recommended Caffey have a lumbar spinal fusion of L4-5 due to Caffey's continued symptoms. Dr. Clatterbuck performed it on March 16, 2021. Caffey did well after the surgery and was off work for two months. In May 2021, Dr. Clatterbuck released Caffey to light-duty work. FGH accommodated Caffey with a temporary light-duty job in the "bubble," where he monitored surveillance screens. Later, due to the COVID-19 pandemic, he was moved to the hospital's "OP room," where officers change clothes and take lunch breaks; however, Caffey testified he had no real job duties there. It is unclear from the record why, but December 26, 2021, was Caffey's last day to work at FGH.[4]

---

[4] On December 15, 2021, Caffey reported another work-related injury in the "OP room" during a Christmas luncheon when he was hit in the head by another officer. In an employer medical evaluation, however, "significant doubt" was found as to whether Caffey received an injury to his neck and cervical spine during this incident.

*Functional Capacity Exam (FCE)*

¶17.   In March 2022, one year after the surgery, Dr. Clatterbuck placed Caffey at MMI for the instant injury and ordered an FCE to determine permanent restrictions, and that exam was performed on April 28, 2022.  The results showed Caffey could work at a sedentary level for eight hours a day for five days a week.  He was assigned a thirteen-percent permanent partial impairment rating to the body as a whole.  Caffey would be limited to lifting fifteen pounds.  More specifically, he could lift from fifteen to twenty pounds rarely, and he could lift up to ten pounds both occasionally and frequently.  He could sit and walk frequently, push up to forty-five pounds of force, and pull up to fifty pounds of force.  Occasionally, Caffey could bend forward while standing and engage in elevated work for up to thirty-three percent of an eight-hour day. Dr. Clatterbuck agreed with the FCE and the impairment rating on May 4, 2022.  The AJ and Commission determined this date to be Caffey's official MMI date.  Caffey's last visit with Dr. Clatterbuck was in June 2022, when he confirmed Caffey could work at a sedentary level full-time.

*Employer's Medical Evaluation*

¶18.   In July 2022, Dr. Lynn Stringer, a neurosurgeon in Flowood, Mississippi, performed an employer medical evaluation on Caffey.  Dr. Stringer found Caffey much improved post-operation and did not think future treatment would be needed.  However, he noted that Caffey's back injury would prevent him from performing jobs requiring "excessive lifting and bending."  Dr. Stringer deferred to Dr. Clatterbuck on Caffey's MMI, impairment

ratings, and work restrictions. Dr. Stringer believed Caffey's impairment rating was completely related to the October 8, 2019 injury.

### Angela Malone, FGH's Vocational Rehabilitation Expert

¶19. FGH hired Angela Malone to make a vocational rehabilitation evaluation of Caffey as to his post-injury employability and wage-earning capacity. At the AJ hearing, Angela Malone was accepted as an expert in vocational rehabilitation. She completed a report of her vocational rehabilitation evaluation dated August 8, 2022, and a supplemental report dated September 16, 2022.

¶20. In making her evaluation, Malone utilized two nationally known methodologies. She evaluated Caffey's education, additional formal training, prior jobs, aptitudes, skills, and current physical limitations. Malone then prepared a list of skills and abilities Caffey possessed, which were numerous.[5] Next, Malone identified ten types of jobs commensurate with Caffey's education, training, and work experience. The jobs included desk officer, surveillance system monitor, skip tracer, administrative assistant, police aide, radio

---

[5] According to Malone's evaluation, Caffey possessed the following skills, which were noted by the Commission:

(a) organizing, planning, and directing the work of others; (b) using tact and courtesy to work with people; (c) working under pressure or extreme circumstances; (d) using weapons and safety devices skillfully; (e) using reason and judgment to deal with people in different situations; (f) thinking clearly, staying calm, and reacting quickly in emergencies; (g) making on-the-spot decisions; (h) following instructions; (i) completing routine or repetitive work; (j) cooperating with others; and (k) reading or copying information without errors.

dispatcher, bonding agent, collection clerk, customer service representative, and gate guard. She also testified that Caffey's past work had given him proficiency in using computers and preparing narrative reports, as well as leadership, supervisory, and analytical thinking skills. Malone testified that Caffey could work with a wide variety of people.

¶21. Malone opined that Caffey was employable and qualified to work in sedentary and even some light-duty positions. Malone explained that, by definition, sedentary work is mostly sitting and lifting up to ten pounds. Light-duty work, by definition, is lifting up to twenty pounds, with some walking and standing. She noted the FCE showed Caffey could lift up to twenty pounds, as well as walk frequently and stand occasionally. Malone testified that after injury, with his work restrictions, Caffey was capable of earning an average of $16.38 per hour; moreover, he had job skills and transferable skills. She noted Caffey earned $18.04 per hour at his job as a security guard at FGH but confirmed that Caffey could not perform any of his previous jobs due to their physical requirements. Therefore, Malone concluded that although Caffey was employable, he had suffered a loss of wage-earning capacity.

¶22. Because there was no permanent job for Caffey to return to at FGH, Malone conducted two labor market surveys to find specific jobs open and available in the Hattiesburg area, and they were given to Caffey's attorney in August and September 2022. The jobs were within Caffey's restrictions and qualifications and near his residence. The first survey had eight open and available jobs with an average hourly wage of $15.23: a

12

remote crisis worker, two dispatcher jobs, receptionist, service coordinator, customer service representative, remote customer service representative, and bonding agent. The second survey had five jobs with an average hourly wage of $18.63:[6] a customer service representative, surveillance investigator, customer experience associate, medical records processing specialist, and claims customer care associate. Malone testified that there were currently 4,260 jobs available in the Hattiesburg area appropriate for Caffey, and he possessed the skill levels needed to land the jobs at the higher end of the average hourly wage figures.

### Caffey's Job Search

¶23. Caffey confirmed that he spent only one day looking for work—August 25, 2022. His "work search report form" was entered into evidence and listed five jobs from Malone's first labor market survey that he inquired about on this day: two dispatch positions, a receptionist, a service coordinator, and a bonding agent. He applied to none of them, though the first three jobs were filled. Caffey testified that he would have difficulty working as a dispatcher now because of new equipment.

¶24. Caffey testified that none of the potential jobs on Malone's surveys were similar to work he had done in the past. Further, Caffey testified that he was not trained in typing or using computer software. Moreover, Caffey did not contact any of the employers listed in the second labor market survey his attorney received from Malone in September 2022, nor

---

[6] This pay rate is greater than his former pay rate at FGH.

was there any evidence Caffey engaged in an independent job search of his own. Further, after Caffey was placed at MMI, he never returned to FGH to seek employment in a different position.

¶25. Caffey testified that he could not return to any of his previous jobs because he was not physically able to do them due to his injuries. Caffey also thought he could not do any work at the time because he took daily medications that made him tired. Caffey testified that within three months of undergoing his spinal surgery in March 2021, he knew he could not return to his prior work as a security guard. Additionally, in his deposition on July 25, 2022, Caffey stated he did not know if he was even willing to try and work either full or part time due to his wife's stroke; however, she had improved by the time of the AJ's hearing on October 7, 2022.

¶26. In August 2022, Angela Mucha-Brooks, Employment Manager of FGH, was contacted by FGH's attorney and asked to find any jobs at FGH suitable for Caffey's sedentary work restrictions. On August 26, 2022, Mucha-Brooks sent Caffey a certified letter making him aware of two positions open at FGH and encouraging him to apply.[7] Caffey, however, never responded to the letter or contacted the hospital about these or any other jobs. One position was in registration at the main hospital, and the other position was in the Family Medicine Residency Clinic. Both were called "PASER" positions—requiring

---

[7] It is this letter that the AJ refers to as the "job offer" letter in his opinion, and the Commission then references two "offered" or "tendered" jobs "about which Caffey failed to inquire."

14

the individual to gather information from the patient for registration, insurance, discharge, and collection of fees. The employee then places the information in a computer.[8] Mucha-Brooks made clear that she had no authority to offer the jobs to Caffey, but she was familiar with the jobs. The starting wage for the jobs was $11.60 per hour with a maximum pay rate of $17.47. Raises were given annually based on an evaluation of the employee's work.

¶27.    Mucha-Brooks testified that she recommended the positions to Caffey because the majority of work (ninety percent) was performed on a computer while sitting at a desk. While the formal job descriptions listed the physical requirements for both jobs as the ability "to lift, handle, push, [and] pull up to [fifty] pounds," Mucha-Brooks testified that there would never be a situation where a person in a PASER position would have to lift or carry fifty pounds—the greatest amount of weight would be "maybe five or ten pounds." Mucha-Brooks testified the lifting and carrying requirements would involve taking a ream of paper out of a box and putting it into a printer. She further explained: "All the job descriptions say [fifty] pounds; however, when somebody has a restriction, we follow the ADA and sit down and do an accommodation discussion with the employee and the manager to see . . . if anything can be done to meet those accommodations." She testified that the general procedure was to allow applicants to apply first to see if they got the job; if they did, the applicants would meet with the managers to make any necessary accommodations. The job description also stated the work required frequent walking, standing, and sitting. Mucha-

---

[8]    The PASER listing in the hospital's registration department specified that the applicant must be "efficient in typing" and "computer literate."

Brooks testified that the employees would be on their feet only about ten percent of the time and only for a minute or two at a time. They may have to leave their desks to greet patients, bring them to a cubicle, or add copy paper to a printer. As for pushing and pulling, Mucha-Brooks testified that PASERs may have to push a patient in a wheelchair, but it would be on a tile floor and easy. Further, if the employee could not push the patient, there would be other employees around who could help. Caffey never applied for either job.

## STANDARD OF REVIEW

¶28. "The standard of review in workers' compensation cases 'is limited to a determination of whether the Commission erred as a matter of law or made factual findings contrary to the overwhelming weight of the evidence.'" *Tillman v. KLLM Transport*, 334 So. 3d 1224, 1226 (¶8) (Miss. Ct. App. 2022) (quoting *Clements v. Welling Truck Serv. Inc.*, 739 So. 2d 476, 478 (¶7) (Miss. Ct. App. 1999)). The Commission's application of law is reviewed de novo and will not be reversed "unless it is clearly erroneous." *Id.* (citing *Westmoreland v. Landmark Furniture Inc.*, 752 So. 2d 444, 448 (¶8) (Miss. Ct. App. 1999)). "The 'Commission is the ultimate fact-finder' and 'the ultimate judge of the credibility of witnesses.'" *City of Jackson v. Sandifer*, 125 So. 3d 681, 686 (¶19) (Miss. Ct. App. 2013) (quoting *Barber Seafood Inc. v. Smith*, 911 So. 2d 454, 461 (¶27) (Miss. 2005)). Therefore, the "facts determined by the Commission may not be disturbed on appeal when those facts are supported by substantial, credible evidence." *Id.* (quoting *Murray v. Ingalls Shipbuilding/NGSS*, 35 So. 3d 561, 562 (¶5) (Miss. Ct. App. 2010)).

16

¶29. Caffey argues that the Commission erred as a matter of law in finding he failed to make a prima facie case for loss of wage-earning capacity under *Jordan*.[9] He also claims the Commission's decision regarding this issue is not supported by substantial credible evidence. Accordingly, Caffey contends that the Commission's order must be reversed and rendered and the AJ's order be reinstated, resulting in a fifty-percent loss in wage-earning capacity and award of permanent partial disability benefits. While the crux of Caffey's argument is on the *Jordan* method, and his analysis of the *Thompson* method is minimal, we shall address both since we find, as did the majority of the Commission, that a prima facie case fails under either method.

¶30. A claimant can establish a prima facie case for total disability in two ways, the *Jordan* or *Thompson* method. Caffey argues that he is entitled to permanent partial disability benefits because he made his prima facie case for wage-earning loss under the *Jordan* method. Further, he claims the Commission's decision denying permanent partial disability is contrary to the evidence and law. While we agree that the Commission made an erroneous finding of fact regarding its *Jordan* analysis on whether employment was "offered" to

---

[9] Caffey also raises numerous arguments that are not pertinent to this issue. Caffey discusses the factors determining the extent of the disability for loss of wage-earning capacity, the likelihood of earning similar wages in an open labor market, the role of employer accommodations in evaluating wage loss, the calculation of permanent partial disability benefits, and the loss of wage-earning capacity despite returning to work with higher wages. Since we are affirming the Commission's decision on the basis that Caffey did not make a prima facie case by either method, we will not address them.

17

Caffey, we find that Caffey did not make a prima facie case under *Jordan* because Caffey never reported back to work after MMI. We find Caffey's job search was unreasonable under *Thompson*. Thus, we affirm the Commission's order denying Caffey permanent partial disability benefits.

### I.    Prima Facie Case under *Jordan*

¶31.    The *Jordan* method triggers a presumption of total disability "[w]hen the claimant, having reached [MMI], reports back to [the] employer for work, and the employer refuses to reinstate or rehire him. . . . The burden then shifts to the employer to prove a partial disability or that the employee has suffered no loss of wage-earning capacity." *Jordan v. Hercules Inc.*, 600 So. 2d 179, 183 (Miss. 1992). Caffey claims the Commission erred in reversing the AJ's decision and finding that after MMI, Caffey failed to report back to work, and FGH did not refuse to reinstate or rehire him. He argues those findings are not supported by the evidence.

¶32.    Regarding Caffey's failure to report back to work,[10] Caffey's MMI date was May 4, 2022. Attendance documents in the record indicate Caffey's last day at work was December 26, 2021, approximately four months before MMI. Caffey argues that the record shows he reported to work "after his injury" in October 2019. While Caffey did report back to work as a security guard after his injury for quite some time, the standard is reporting to work after

_____

[10] The AJ did not rule on this issue, never addressing whether Caffey reported back to work after MMI and, instead, focusing on the fact that FGH could not return Caffey to his former job or a similar job.

18

MMI, not after the work-related injury, which was approximately two-and-one-half years before MMI. The record does not indicate Caffey ever attempted to report back to FGH after MMI. Unfortunately, by that time, Caffey's wife had suffered a stroke on March 29, 2022, and he was serving as her caregiver. During his July 25, 2022 deposition, Caffey admitted that due to his wife's stroke, he did not know if he was even willing to try and work either full time or part time. The Commission was correct in finding Caffey failed to report back to work after the MMI date of May 4, 2022.[11] No presumption was thus created under *Jordan*.

## II. Prima Facie Case under *Thompson*

¶33. Under *Thompson*, the claimant creates a prima facie case by making a reasonable effort to find other employment. *Thompson v. Wells-Lamont Corp.*, 362 So. 2d 638, 641 (Miss. 1978). Relevant factors that constitute a "reasonable effort" include "the economic and industrial aspects of the local community, the jobs available in the community and surrounding area, the claimant's general educational background, including work skills, and the particular nature of the disability for which compensation is sought." *Id.* "The

---

[11] Less clear is the Commission's determination that "[e]ven if Caffey had reported back to work," FGH "did not refuse" to reinstate or hire Caffey after his injury, as the Commission erroneously stated that FGH "offered" Caffey "at least two other jobs which were within his restrictions." The evidence reflects that Caffey was not "offered" or "tendered" either job but was simply made aware of them and encouraged to apply; however, he never did. FGH argues that Caffey's lack of response about the two jobs cannot justify a basis for claiming FGH refused him employment. We decline to rule on this portion of the *Jordan* test since Caffey did not meet his initial burden of reporting to work after MMI.

Commission must be persuaded that the job search was conducted as a good faith, diligent, and reasonable attempt to secure other employment." John R. Bradley & Linda A. Thompson, *Mississippi Workers' Compensation* § 5:30, at 197 (2024-2025 ed.). If the claimant makes a prima facie case for finding reasonable employment, "the burden of proof shifts to the employer to rebut or refute the claimant's evidence." *Thompson*, 362 So. 2d at 641. Then, "evidence indicating that suitable employment was available to [the] claimant becomes relevant and admissible." *Id.* "The employer may present evidence (if any) showing that the claimant's efforts to obtain other employment were a mere sham, or less than reasonable, or without proper diligence." *Id.*

¶34. Caffey does not address this issue beyond the two PASER jobs; he merely argues that those jobs are outside his restrictions, even though ninety percent of the work is performed sitting at a desk. While both job descriptions did require the ability to lift, handle, push, and pull up to fifty pounds, Mucha-Brooks testified that there would never be a situation where a person in a PASER position would have to lift or carry fifty pounds, only about five to ten pounds, such as a ream of paper. Further, if the applicant had a restriction and was hired, Mucha-Brooks testified that the manager and employee could meet and work out an accommodation. Caffey also claims that he does not have the computer skills required for the two PASER positions, which consist of entering data about patients, but his work history shows otherwise. Caffey had numerous prior law enforcement jobs where he had to use a computer, including his job at the hospital where he had to write incident reports.

20

Importantly, Caffey never applied for these positions, inquired about the requirements, or responded to Mucha-Brooks's letter in any way. There is also no evidence Caffey ever contacted FGH about other possible jobs.

¶35. We agree with the Commission that Caffey failed to perform a reasonable job search. Malone's vocational testimony showed Caffey possessed transferable job skills, which made him well-suited for several available jobs at the sedentary level. Caffey had several potential opportunities for employment but only conducted a job search for one day, on August 25, 2022. On that day, he inquired about five jobs that were identified on Malone's first labor market survey, but he applied for none. Three of the jobs were filled, but Caffey did not think he had the computer skills or the physical requirements to do the jobs. For the other two jobs, Caffey did not think he had the skills to perform them.

¶36. Analyzing Caffey's job search under the factors described in *Thompson*, Caffey's job search was unreasonable in several ways. At the time of the hearing, Malone testified that there were approximately 4,260 positions available in the Hattiesburg area that would be suitable for him, with most requiring sedentary to light-duty work, and openings were occurring regularly. The area's economy was healthy and beneficial for job seekers. Caffey's training and work history showed he had numerous vocational skills, making him attractive to employers. While Caffey was limited to sedentary and light-duty work due to his low back, Malone found his prior work experience compensated for these limitations.

¶37. Caffey had from MMI on May 4, 2022, to the AJ hearing in October 2022, or five

21

months, to find a job, and he only half-heartedly looked for a job one day, by using the leads of FGH's vocational expert Malone. There is no evidence Caffey independently searched for employment more suited for him. A majority of the Commission also noted some possible reasons for Caffey's lack of motivation to find a job—he was already collecting state retirement income and his various medications made him tired. For the above reasons, we agree with the Commission that Caffey did not make a prima facie case for loss of wage-earning capacity under *Thompson*.

## CONCLUSION

¶38. The Commission did not err in reversing the AJ's award to Caffey of permanent partial disability benefits. Regardless of whether the Commission made a fact-finding error that Caffey was "offered" two jobs at FGH after MMI, the Commission did not err as a matter of law in finding Caffey failed to return to work after MMI and failed to make a reasonable job search. Therefore, Caffey did not make a prima facie case for loss of wage-earning capacity under *Jordan* or *Thompson*, respectively. Accordingly, we affirm the Commission's order.

¶39. **AFFIRMED.**

**CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

22